**William KNOX, Appellant,**

v.

**UNITED STATES LINES COMPANY,** Appellee,

v.

**T. HOGAN CORPORATION.**

No. 13408.

United States Court of Appeals Third Circuit.

Argued March 23, 1961.

Decided June 21, 1961.

On Petition for Rehearing July 14, 1961.

S. Gerald Litvin, Freedman, Landy & Lorry, Philadelphia, Pa., for appellant.

Rawle & Henderson, Harrison G. Kildare and Thomas F. Mount, Philadelphia, Pa., for appellee.

Before KALODNER, STALEY and HASTIE, Circuit Judges.

HASTIE, Circuit Judge.

This case presents the familiar situation in which a longshoreman, injured on a ship while working for an independent contractor in unloading cargo, seeks to recover damages from the shipowner alleging both that the ship was unseaworthy and that the ship negligently failed to provide a reasonably safe place for the longshoremen to work. The accident occurred when a roll of burlap, unintentionally dislodged from the stowage by the longshoremen, fell or rolled upon a workman's ankle.

The case went to the jury on special interrogatories. The jury found that there was no inadequacy of the original stowage such as would constitute unseaworthiness and that the ship was not negligent in the performance of its duty to use due care in providing a safe place for the longshoremen to work. It was also found that both the complaining longshoreman and the stevedoring company which employed him were at fault in negligently handling the cargo. Accordingly, judgment was entered for the defendant shipowner. The injured longshoreman has appealed.

A principal assignment of error concerns the failure of the trial judge to give requested instructions on a particular theory of negligence. Appellant takes the position that, even though the cargo may have been properly stowed when the unloading began, the longshoremen broke the stowage down in such a way as to create a serious risk that, as the unloading continued, the stowage would, as it subsequently did, collapse and injure someone. In this situation, appellant argues that the jury could properly have found the ship negligent because its officers, who exercised general supervision over the unloading, failed to observe the unsafe condition thus created and have it corrected. To implement his contention appellant requested the following instruction to the jury:

"If you should find from the facts in this case that the accident was caused by dangerous or hazardous methods of discharge employed by the stevedore employees, including the plaintiff, you may find that the defendant shipowner was negligent in permitting employees of T. Hogan Corporation to engage in such dangerous or hazardous methods aboard its vessel."

The court refused to give this instruction. Later, in denying a motion for a new trial, the court explained its refusal to submit this theory of negligence to the jury, saying:

"before the trier of fact may find such property-owner negligent, there must be evidence from which the trier of fact could conclude that the owner *knew or should have known* of the existence of the dangerous condition. In the case at bar, there was no evidence whatsoever from which the jury could have concluded that the defendant-shipowner knew or should have known that the longshoremen were engaging in this dangerous practice, assuming of course that they were, since the act which caused the plaintiff's injury was an instantaneous thing."

In these circumstances we have examined the evidence to determine whether a jury could properly have found that the ship's officers were negligent in permitting the longshoremen to unload the ship in a way dangerous to themselves.

The longshoremen involved furnished the only evidence in the record as to what they did in unloading the hold in which the accident occurred. The cargo in this hold consisted of cylindrical rolls of burlap, each weighing a thousand pounds or more. The individual rolls were ten to twenty feet long and varied to some extent in diameter. Most of them were two to two and one-half feet in diameter. A few were three or even four feet in diameter. The rolls were laid side by side and layer upon layer filling the hold to a height of some fifteen feet. Each roll rested in the depression formed by the circumferences of two rolls lying parallel and adjacent to each other in the layer immediately below it.

The work of unloading this hold began about 9 A.M. and the appellant was injured shortly after 11 A.M. The longshoremen began their work by unloading the burlap rolls in the center of the hold under the hatch opening to a depth, as estimated by the longshoremen themselves, of from six to eight feet, or three or four layers. The opening thus created was wider at the top than at the bottom because the marginal roll in each layer rested on and between two rolls of the next layer. Thus, each layer extended somewhat farther—about the radius of a roll—into the cleared area than did the

next overlying layer. Looking upward from the floor of the cleared area the face of the stowage sloped away from the center of the hatch, like the face of a pyramid. In different metaphor, the clearing was somewhat "V" shaped.

Next, the longshoremen stood in the cleared area on the exposed top of the highest undisturbed layer of burlap, which constituted the floor of the clearing, and undertook to remove the cargo from the wings by breaking down the lateral slope of the stowage which confronted them. They proposed to begin by dislodging the top bale from the face of the pyramid and guiding it under manual restraint as gravity caused it to slide down the slope to the small cleared floor space. There, slings would be attached to the roll and lifting gear would be used to remove it from the hold.

There was testimony that as this operation began a man standing on the floor could just reach up to the middle of the top roll which was about to be dislodged. Several of the longshoremen stood in the clearing near the after end of the top roll, in order to handle it from there. Appellant stood near the forward end of the roll. Having thus disposed themselves, the longshoremen began to shift the top roll. In so doing they accidently dislodged underlying rolls so that two or three rolls slid uncontrolled down the slope to the floor. One of them struck and broke appellant's ankle. It is this mishap which appellant would attribute to negligence on the part of the ship in failing to use due care to keep the hold a reasonably safe place to work during the unloading operation.

Beyond the longshoremen's account of what happened during the unloading operation, there was testimony by an expert witness that it was needlessly dangerous to clear out a center opening as deep as seven or eight feet before proceeding laterally to remove the upper layers of cargo from the wings. In the opinion of this witness it would have been practical and proper to clear the central area only to "man height", meaning not more than the shoulder height of a standing man.

In this view of proper unloading procedure, the longshoremen should have made the central opening only two rolls deep, rather than three or four.

Appellee has admitted that the discharging of cargo was conducted under the "general supervision" of the ship's officers, averring at the same time that the stevedoring company supplied the "immediate supervision" of the operation. In its response to interrogatories appellee added the more detailed statement that its watch officer "was in general charge of seeing that the loading and discharging operations were carried out by the stevedoring contractors in accordance with the ship's loading plan".

In Brabazon v. Belships Co., 3 Cir., 1953, 202 F.2d 904, 906, 908, we discussed the nature and extent of a ship's responsibility for the supervision of an independent contractor's operations in that kind of situation, saying:

"The owner who retains control of the vessel as a whole and general supervision of what is being accomplished by an independent contractor in one part of the vessel is not relieved of all responsibility in connection with the prevention, discovery or correction of new hazards which may make the area temporarily used and occupied by independent contractors an unsafe place to work. * * In such cases as we are now considering, the nature of the work being done in the hold, the fact that it was being accomplished by responsible independent contractors whose employees were the only persons working in the hold, and the fact that the area was safe when that work began, all may have bearing upon the issue of what would constitute due care by the shipowner during the loading period. * * *
* * * * *

" * * * A practical view of the operation * * * of the independent contractor and his employees should influence judgment of what affirmative precautionary measures the shipowner can reasonably be ex-

pected to take in each set of circumstances to safeguard the contract operation and its immediate environment as work progresses."

Cf. Restatement of Torts, § 344, comment b.

We shall apply this legal analysis to the circumstances of this case. In order to hold that the ship was liable here, a jury would have to find that in the exercise of due care before the accident the ship's officers should have (1) observed that the stow had been broken down in the center to a depth of seven or eight feet, (2) concluded that the exposed face of the stow was dangerously high, and (3) caused the timely correction of this condition. We think the record does not provide a sufficient basis for so comprehensive a finding.

The evidence shows that the first two hours of the morning working period were devoted to the removing of the top layers of cargo directly beneath the hatch opening. It also appears and is not disputed that the longshoremen began the removal of cargo from the wings as soon as this central area had been cleared to a depth of seven or eight feet. On the evidence, the clearing of the central area to a depth of four or five feet was safe and proper. Appellant was injured about two hours after the beginning of this operation. Thus, the dangerous height—the difference between four or five feet and seven or eight feet—could have existed only a very short time before the accident occurred, particularly since the opening was "V" shaped and thus required more time for clearing the top layers than the bottom.

As our decision in the Brabazon case indicates, the law does not impose a duty upon a ship to provide continuing observation and immediate supervision of work being done by a qualified independent contractor in unloading ordinary cargo.[1] If an obviously hazardous condition had been created by the longshore-

men and permitted to exist long enough for normal occasional observation of the course and progress of the work to disclose the existence of the danger to some officer of the ship, then the ship should have been found negligent. Cf. Beard v. Ellerman Lines, Ltd., 3 Cir., 1961, 289 F.2d 201; Aldridge v. States Marine Corp., 9 Cir., 1959, 265 F.2d 554, certiorari denied, 361 U.S. 814, 80 S.Ct. 53, 4 L.Ed.2d 61. For example, if the unloading had created a high vertical wall of cargo without lateral support facing the work space in the hold and such a condition had existed for several hours, a jury might properly have found negligence on the part of the ship in failing to discover this danger and have it eliminated. Cf. Curtis v. A. Garcia Y Cia, 3 Cir., 1957, 241 F.2d 30. But here we are dealing with the difference between the sloping face of a stow four or five feet in height, which admittedly would have been safe, and a slope two or three feet higher, which an expert witness considered dangerous. Moreover, we have a situation where that height could have existed only for a very short time, certainly a period of minutes rather than hours, before the accident occurred. Perhaps the ship's officers could reasonably be charged with sharing the expert's understanding that a seven or eight foot slope was dangerously high. But the decisive consideration is that it would have been speculative or arbitrary for a jury to find on this record that the condition had existed long enough to make blameworthy the failure of the ship's deck officer to discover it.

Furthermore, even if the condition had been observed and considered dangerous, it is pertinent to ask whether there was anything that a ship's officer should have done which would have been calculated to avoid the accident which occurred. He could have instructed the stevedoring foreman that during the remainder of the operation no more than two layers of cargo should be removed from any area before clearing the surrounding area to

---

1. A shipowner's responsibility may be greater if he has authorized something unusually and inherently dangerous to be done on the ship. Halecki v. United New York and New Jersey Sandy Hook Pilots Ass'n., 2 Cir., 1960, 282 F.2d 137.

the same depth. But that would not have helped appellant since he was injured in the very first attempt to remove a roll of burlap from the wings after the initial clearing to a seven or eight foot depth in the central area. In these circumstances, it is difficult to see what admonition, within the responsibility of the ship, could have avoided this accident. Certainly, an instruction immediately to reduce the height of the exposed cargo by removing the top layer of burlap from the wings would merely have told the longshoremen to do what they actually tried to do. The only other thing which might have been helpful would have been a specific direction as to some presumably safer way of easing the top roll of burlap from its elevated position to the floor. But that clearly was not the province or responsibility of the ship. The physical handling of an ordinary bale or bundle is the clearest example of a detail within the special competence and peculiar responsibility of the stevedoring contractor. There was no reason to believe that the longshoremen would not proceed properly and carefully in removing the bundle in question. Given time for notice, it may well have been the ship's responsibility to order that the face of the stowage be lowered, but it was not the ship's responsibility to tell the longshoremen how to handle each individual bundle in accomplishing this result. For this reason, we see nothing which the ship's officers should have said or done which would have altered the course of events that led to appellant's injury.

In brief, there are two reasons why failure to give the requested instruction was not reversible error. First, it would be speculative or arbitrary to say on the present record that the excessive height of the stow had existed long enough so that the ship's officers should have discovered it. Second, there is no reason to believe that any admonition properly required of these officers might have avoided the accident.

Appellant's second major contention is that the court's charge failed to explain that, regardless of negligence, the stowage may have been rendered unseaworthy by the action of the longshoremen in clearing out a central area to a depth of seven or eight feet. In Cookingham v. United States, 3 Cir., 1950, 184 F.2d 213, certiorari denied, 1951, 340 U.S. 935, 71 S.Ct. 495, 95 L.Ed. 675, this court took the position that a "transitory" unsafe condition resulting from the dropping of some Jello on a stairway, did not constitute unseaworthiness. Cf. Grillea v. United States, 2 Cir., 1956, 232 F.2d 919, applying the same distinction but reaching a contrary result on the facts. More recently, however, the Supreme Court decided in Mitchell v. Trawler Racer, Inc., 1960, 362 U.S. 539, 80 S.Ct. 926, 928, 4 L.Ed.2d 941, in which a seaman was injured as a result of the dropping of slime on a ship's rail, in the course of an unloading operation, a very short time before the accident. An instruction that the ship would be liable only if the condition had existed "for a period of time long enough for the respondent [ship] to have learned about it and to have removed it" was held to have been error. The Court refused to treat the transitory character of the unsafe condition as legally significant. For an even more recent application of this holding to a case not significantly different from the present case, see Holley v. The Manfred Stansfield, D.C.E.D.Va.1960, 186 F.Supp. 212. Under the Mitchell doctrine, the evidence here created a jury question as to whether the seven or eight foot "V" dug out in the stowage by the longshoremen constituted an unseaworthy condition.

In denying a motion for a new trial the district judge pointed out that the only specific contention with reference to unseaworthiness in the complaint, at pretrial, or in plaintiff's proposed instructions, was that the original stowage of the burlap rolls without chocks or dunnage to prevent their lateral movement made the cargo unseaworthy from the time of loading. While the trial judge's analysis of the limited range of the plaintiff's contentions might have justified a corresponding limitation of the charge,

it appears that the matter of a transitory unseaworthy condition was in fact covered by the following language in a supplementary charge given just before the jurors retired to consider their verdict:

"If you find that the gang of longshoremen directly caused the accident by breaking down the rolls of burlap so as to create the risk of such an accident as actually occurred, the ship owner would not be held responsible for a temporary and transitory unsafe condition of which the ship's officers would have no adequate warning."

The plaintiff duly excepted to this instruction. On its face, this language covered and restricted liability for unseaworthiness resulting from "a temporary or transitory unsafe condition". We understand that, with respect to the condition created by the longshoremen, the case had been so presented as to focus the attention of the trial judge primarily upon the question of negligence in making the hold an unsafe place to work. Moreover, to the extent that he may also have considered unseaworthiness, our Cookingham decision seemed to justify the charge as given. However, Cookingham was in effect overruled, and just such a charge as this one was held to be reversible error, by the Supreme Court in Mitchell v. Trawler Racer Inc., supra. Since the ship in the Mitchell case was held responsible for the slippery condition of a rail created in unloading cargo even though that condition had not existed long enough to afford the ship a reasonable opportunity to discover and correct it, the court below erred in charging that "the ship owner would not be held responsible for a temporary and transitory unsafe condition of which the ship's officers would have no adequate warning."

One additional matter requires mention. Since judgment was entered for the defendant on the principal claim, the court also dismissed the defendant's third-party claim against the stevedoring company. Obviously, our conclusion that there was reversible error in the trial of the principal claim requires vacating the judgment on the third-party claim as well.

The judgment on the principal claim and on the third-party claim will be vacated and the cause remanded for a partial new trial limited to the issue of possible unseaworthiness caused by the manner of breaking down the stowage and any third-party liability resulting therefrom.

On Petition for Rehearing

PER CURIAM.

A problem of jurisdiction, not heretofore mentioned during the course of this appeal, has been brought to our attention in petitions for rehearing.

In the court below this case was submitted to the jury on special interrogatories. The answers of the jury were such as to require judgment for the defendant United States Lines Co. on the principal claim. With the United States Lines Co. thus relieved of liability, it followed as a matter of course that the claim of the United States Lines Co. against Hogan for indemnity became groundless. Accordingly, on April 25, 1960, the trial judge filed a single order, entered by the clerk the following day, that "judgment is hereby entered in favor of defendant, United States Lines Company, in the original action, and against plaintiff, William Knox, with costs to the defendant, and the third-party action between United States Lines Company and T. Hogan Corporation is hereby dismissed".

Within ten days thereafter, the plaintiff filed a proper motion for a new trial on the principal claim and the same day the United States Lines Co. filed a precautionary motion "to set aside the judgment of dismissal entered in the third-party action and to grant a new trial in the said third-party action, in the event that a new trial is granted in the original action". In due course the court denied plaintiff's motion for a new trial on

the principal claim. Perhaps through inadvertence, perhaps because United States Lines requested a new trial on the third-party claim only if a new trial should be granted in the original action, no order was made disposing of the motion for a new trial of the third-party claim. This undecided motion is now called to our attention for the first time as the basis for an argument that the judgment below lacked appealable finality.

It is clear that when the timely motions for new trials were filed the judgment of April 25th on the claim and the third-party claim ceased to be final. Moreover, the disposition of only one of these motions could not make the judgment on either claim final because, under Rule 54(b), Federal Rules of Civil Procedure, 28 U.S.C.A., in litigation involving multiple claims judgment on one claim cannot become final until final disposition of all claims. The undecided motion for a new trial prevents the judgment on the third-party claim from being final and under Rule 54(b) the pendency of the third-party claim prevents judgment on the principal claim from being final. Although the foregoing analysis is highly technical, we think it is unavoidable and controlling. It follows that we lack jurisdiction to entertain this appeal.

At the same time, it seems proper to point out the situation that will exist after this appeal is dismissed. When the case is returned to the District Court the judgment on the principal claim and the judgment on the third-party claim will both lack finality because of the pendency of the motion for a new trial on the third-party claim. It will, therefore, still be within the power of the District Court to reconsider its judgment on both claims and to grant new trials, if it shall deem such action proper. Although the views prematurely expressed in our original opinion on this appeal will have no binding effect upon the trial judge, he may properly consider whether the reasoning in that opinion has merit when he decides whether to grant new trials on the claim and the third-party claim.

After due consideration of the new matter raised in petitions for rehearing it is hereby ordered that the judgment of reversal, requiring new trials in this case, shall be vacated. Thereafter, this appeal shall be dismissed for lack of jurisdiction.