Robert U. SCOTT, Appellant,

v.

ISBRANDTSEN COMPANY, Inc.,
Appellee.

No. 8994.

United States Court of Appeals
Fourth Circuit.

Argued Sept. 30, 1963.

Decided Jan. 13, 1964.

Sidney H. Kelsey, Norfolk, Va., for Appellant.

John W. Winston, Norfolk, Va., and George W. Sullivan, New York City (Seawell, McCoy, Winston & Dalton, Norfolk, Va., and Lilly, Sullivan & Purcell, New York City, on brief) for Appellee.

Before HAYNSWORTH, BOREMAN and J. SPENCER BELL, Circuit Judges.

BOREMAN, Circuit Judge.

Robert U. Scott, plaintiff-appellant, seeks to recover damages from the defendant-appellee, Isbrandtsen Company, Inc., for personal injuries sustained by him aboard the S.S. FLYING ENDEAVOR while engaged in unloading her cargo. The responsibility of the defendant was that of a shipowner as the vessel was operated and controlled by it under a bareboat charter. A judgment in favor of Isbrandtsen was rendered by the District Court, based upon the jury's answer to only one special interrogatory. Scott moved to set aside the verdict and for a new trial, which motion was denied, and he has appealed. We think he is entitled to a new trial.

Scott was injured in an accident which occurred aboard the FLYING ENDEAVOR on January 27, 1961. He was a longshoreman, employed by Whitehall Terminal Corporation, and was assigned with fellow employees to discharge a cargo of heavy bales of piece goods from the vessel. The complaint alleged unseaworthiness of the vessel and negligence of Isbrandtsen.

Whitehall, an independent stevedore contractor, was impleaded as a third-party defendant by Isbrandtsen. Isbrandtsen contended, both in its answer to plaintiff's complaint and in the third-party complaint, that Scott's accident and resultant injuries were due to the negligence and carelessness of Whitehall, its

agents, servants and employees, in the performance of their duty, all in breach of the warranty of workmanlike service owed by Whitehall. During the course of the trial, Isbrandtsen and Whitehall stipulated that the issues raised by the third-party complaint and answer thereto would not be submitted to the jury but would be determined by the District Court at the conclusion of the trial of Scott's case against Isbrandtsen and upon the evidence presented therein.

The trial court propounded to the jury certain special interrogatories numbered 1 through 6 which are fully set out below.[1] The jury answered Interrogatory No. 1 in the affirmative and, as directed by the court, answered no others. Scott bases his appeal upon alleged errors in the trial court's charge, the court's refusal to charge as requested, errors in Interrogatory No. 1, and the order of submission to the jury of these special interrogatories, contending that he has been deprived of his right to a jury trial in violation of guarantees of the Seventh Amendment to the United States Constitution, on the issues of Isbrandtsen's alleged negligence and breach of warranty of seaworthiness.

The FLYING ENDEAVOR was berthed at Norfolk, Virginia, and Whitehall had been engaged by Isbrandtsen to discharge the cargo. Scott and his fellow longshoremen, together with their hatch boss and their job supervisor, were assigned to work aboard the vessel. Bales of piece goods, loaded at Hong Kong, were stowed in the lower hold of the vessel's No. 4 hatch. After the No. 4 hatch was opened at 8:00 o'clock A.M., eight longshoremen, including Scott, were sent into the hatch and the actual discharge of the cargo began about 8:30 A.M. The No. 4 lower hold was divided into two sections by the shaft alley tunnel housing

1. "SPECIAL INTERROGATORIES

"(1) If Whitehall Terminal Corporation, its agents or employees, were negligent in handling the bales of piece goods aboard the S.S. FLYING ENDEAVOR, was such negligence, without regard to unseaworthiness, the sole proximate cause of the plaintiff's accident?

YES (X) NO ( )

(If question 1 is answered in the affirmative, the jury shall *not* answer any further questions. Otherwise the jury *must* answer the remaining questions unless otherwise indicated.)

"(2) Was the S.S. FLYING ENDEAVOR seaworthy, as defined in the Court's charge, at the time of the plaintiff's accident?

YES ( ) NO ( )

(If question 2 is answered in the affirmative, the jury shall *not* answer question 3. If question 2 is answered in the negative, the jury *shall* answer question 3.)

"(3) If the S.S. FLYING ENDEAVOR was unseaworthy, did such unseaworthiness proximately cause or contribute to the plaintiff's accident?

YES ( ) NO ( )

"(4) Was the defendant, Isbrandtsen Company, Inc., its agents or employees, negligent at the time of plaintiff's accident?

YES ( ) NO ( )

(If your answer to question 4 is in the negative, the jury shall *not* answer question 5. If your answer to question 4 is in the affirmative, the jury *shall* answer question 5.)

"(5) If the defendant, Isbrandtsen Company, Inc., was negligent, did such negligence proximately cause or contribute to the plaintiff's accident?

YES ( ) NO ( )

"(6) If you conclude that the plaintiff is entitled to recover, what amount is he entitled to receive?

$————————————"

which extended down the center. Beside the ship's cargo gear, which was not claimed by Scott to have been in any way defective or responsible for his injuries, the longshoremen were supplied by Whitehall with blunt hand cargo hooks to be used in handling the bales since sharp hooks could not be used without danger of damage to the contents of the bales. Four longshoremen were assigned to work on each side of the shaft alley tunnel. Scott, Fonville, Brown and another longshoreman began the discharge of the bales on their side. The cargo had been stowed in what was described as a "tight block stow" which extended across the ship from port to starboard and aft from the forward bulkhead to a location approximately eight or ten feet back of the edge of the hatchway opening in the lower hold. Each bale was tightly compressed, bound by metal bands, measured about 38 inches by 29 inches by 18 inches and weighed approximately 450 pounds. There were cloth loops at or near the ends of the bales through which the longshoremen could place their blunt hooks in handling the bales. In approximately six layers or tiers, the bales were stowed horizontally, but in the next or topmost tier the bales were stowed vertically with the top ends up underneath the ceiling or overhead of the hold from side to side.

Ordinarily two men were required to handle a bale, one on each side, and it was customary to roll the bales in horizontal position slowly toward and into the cargo net. The loaded net was then lifted out of the hatch by winches. It was a part of Scott's job, with the help of another, to place the bales in the cargo net. The work progressed without incident until about 10:00 o'clock A.M. and at that time a substantial number of the bales had been discharged. The longshoremen had taken off all the bales which were stowed in vertical position in the top tier except one last row of bales stowed between a beam and the forward bulkhead. In doing this work the men had dug into the stow and had taken out three or four layers or tiers until the stow took on the appearance of a rough set of steps. Because of the tight stowage and the cramped working space, it was impossible for two men to work at pulling out the last row of these vertically positioned bales. Fonville was working alone and placed his blunt hook in the cloth loop of a bale which he attempted to move but the loop broke. He then attempted to work the bale free with his hands by pulling sideways and forward. The accident occurred while Scott was standing on the lowermost level of the remaining tiers of bales with his back to Fonville. He was unaware that Fonville had dislodged the bale and that it had started rolling down toward him. Fonville was unable to check it and as the bale moved end over end it hit another bale in the stair-step stow, bounced over it and struck Scott. Fonville stated that he did not expect the bale to reach Scott until it "double-headed." Belatedly Fonville yelled a warning but not in time for Scott to get out of the way.

The District Court charged the jury at length concerning the plaintiff's burden of proof, the credibility of witnesses, the shipowner's liability for injuries resulting from breach of warranty of seaworthiness and from negligence and failure to provide a safe place to work. The court told the jury that it was to find the facts and to apply the law as explained by the court; that it was not necessary for the plaintiff to prove both unseaworthiness and negligence and proof of either would be sufficient. The court undertook to explain the submission of the interrogatories, commenting upon each one in turn. Referring specifically to the first interrogatory and after reading it to the jury, the court stated:

"Now, when I use the word, 'sole,' I mean just what it says in there. 'Sole' necessarily excludes any other proximate cause, that is to say, it necessarily excludes any proximate cause that may be attributable to the unseaworthiness, if any, of the vessel and it necessary [sic] excludes any proximate cause which may be attributable to the negligence of the

defendant, Isbrandtsen and Company, if any.

"The suit is not against Whitehall Terminal Corporation, it is against Isbrandtsen and Company.

"Now, if you answer this Question Number 1 in the affirmative, that is to say, if your finding is that the sole proximate cause of the accident was the negligence of Whitehall Terminal Corporation, its agents or employees, in the handling of the bales of piece goods aboard the vessel, then you do not answer any other question.

"On the other hand, if it was not the sole—and again I am emphasizing the fact that we are dealing with the sole proximate cause—if it was not the sole proximate cause, then you must pass to the next question, Question 2, 'Was the S. S. Flying Endeavor seaworthy, as defined in the Court's charge, at the time of the plaintiff's accident?' "

The court further charged the jury as set out below.[2] The court charged the jury, as a matter of law, that Scott was entirely free of contributory negligence and withdrew that issue from jury con-

2. "The defendant ship owner is presumed in law to have been free of any negligence and the vessel known as the *FLYING ENDEAVOR* is presumed in law to have been seaworthy. Therefore, the plaintiff can not recover in the case unless and until he overcomes these presumptions and proves by a preponderance of the evidence that the defendant, ship owner, was guilty of negligence and/or that the *FLYING ENDEAVOR* was unseaworthy, or that both negligence and unseaworthiness existed, and until the plaintiff further proves that such negligence or unseaworthiness was the proximate cause of or proximately contributed to the plaintiff's accident and the injuries, of course, for which he now seeks to recover in this accident.

\* \* \* \* \*

"As to the question of the alleged unseaworthiness by reason of the allegedly improper stowage of cargo, may I say to you that cargo may create an unseaworthy condition if it is not stowed for safe discharge by the longshoremen. Cargo is improperly stowed if stowed in a manner which would create a hazardous or unsafe condition in discharging the cargo or in taking it out of the hold. The cargo may create an unsafe and unseaworthy condition because it is not properly stowed or put in the hold of the vessel. If the manner in which it is stowed makes it hazardous or unsafe for discharge then the ship owner is liable to the plaintiff if he is injured in discharging said cargo, and if you conclude that such unsafe or unseaworthy condition, if any, proximately caused *or proximately contributed* to the accident.

"And so if you believe by a preponderance of the evidence in this case that the cargo was stowed in such a manner as to create a hazardous or unsafe con-

dition in removing the cargo from the hold, and that such a condition rendered the ship unseaworthy, then if you further believe by the preponderance of the evidence that such unseaworthiness, if any, was the proximate cause *or proximately contributed* to the accident, you shall answer the interrogatories accordingly and find for the plaintiff.

"If however, you believe that the cargo was properly stowed in such a manner as to permit reasonably safe removal of the cargo from the lower hold, or that the sole proximate cause of the accident was either the negligence of Whitehall Terminal Corporation, acting through its officers, agents or employees, *or that the method of operation used in removing the cargo was the sole proximate cause of the accident, then the defendant is not liable.* (Emphasis supplied.)

\* \* \* \* \*

"A single injury may result from the combined negligence of two or more persons, or from the unseaworthiness of the vessel and the negligence of one or more persons. So long as each cause contributes to bringing about the injuries, each party is responsible for his own fault, whether or not the injury would have occurred had there been no fault on the part of the other. In this particular case if you find that the cargo was unsafely and improperly stowed for discharge by the longshoremen, and that this was a proximately contributing cause to the plaintiff's injuries, then the defendant is liable for unseaworthiness. Or if you find that the defendant, Isbrandtsen Company, failed to furnish the plaintiff with a safe place to work which proximately contributed to causing the plaintiff to be injured, then your verdict of course would be in such event in favor of the plaintiff."

sideration. Vigorous objection was interposed by Scott's counsel to portions of the court's charge, to the substance and form of Interrogatory No. 1, the order in which the interrogatories were submitted for consideration by the jury and the court's failure and refusal to charge as requested.[3]

3. Mr. Kelsey (of plaintiff's counsel): "Before I give the Court the exceptions I would like to state that in chambers when the Court's charge was discussed, I specifically request [sic] the Court to charge this particular charge: 'If you believe the employees of the stevedore by any fault of their own or negligence rendered the plaintiff's place of work unsafe then the ship owner is liable, as the stevedore's employees or longshoremen to render the vessel unseaworthy.' Your Honor refused to give me that charge."

The Court: "That's correct." * * *

Mr. Rabinowitz (of plaintiff's counsel): "I would like to point out that we are requesting Number 3, 4 and 5 [included in plaintiff's request for jury charge], which deal with the bale's loops and straps—were refused by the Court as a whole—and our request Number 11 and 12, which dealt with the plaintiff's fellow-longshoremen creating a condition in the bales, a pro tanto to an unseaworthy condition which we take it is the law of the Crumady and Grillae case which is cited."

* * * * *

Mr. Rabinowitz: "We also would like to except and object to the Court's statement that the stevedore's method of discharging is completely beyond the responsibility of the ship. We feel that the method of discharging by the stevedores can render the vessel unseaworthy which would be the ship's responsibility and secondly, that the method of discharging if known, or should be known by the Mate or Chief Mate of the vessel who is the over-all supervisor of the cargo operation in accordance with the evidence in this case that that too would render liability on the ship for negligence and that a statement that the stevedore's method of discharge of cargoes is completely beyond the responsibility of the ship is an incorrect statement and we respectfully object to that.

"As to the special interrogatories that were presented to the jury, Judge, we respectfully except to them, first, in the whole and the form that they were presented, that is, specifically that the jury was asked in the special interrogatories to first determine the liability of Whitehall Terminal Corporation, its agents or employees, before deciding what the determining factors in this case were and that is whether the ship is unseaworthy or negligent and whether this unsea-worthiness or negligence is a proximate cause of plaintiff's injuries.

"We feel that this limits the jury in going to that question first and we respectfully except and object to the order of the special interrogatories.

"We also feel that the wording of the first interrogatory—states, 'If Whitehall Terminal Corporation, its agents or its employees,' we feel that the use of the word 'if' carries an assumption of negligence to the jury and that the question should be in question form not in an alternative, if than, but was Whitehall Terminal Corporation, its agents or employees negligent, and we feel that the word 'if' carries an assumption with it that they in fact were negligent. We feel that wording is out of order."

* * * * *

Mr. Kelsey: " * * * Your interrogatory number 2, the form of your interrogatory makes the jury answer each question before you get to determine the liability of the ship owner to the plaintiff. So, you have got 2, 'Was the Flying Endeavor seaworthy as defined in the Court's charge?' And then you have got again, 'If the Flying Endeavor was unseaworthy, did such unseaworthiness proximately cause or contribute to the plaintiff's accident?' "

The Court: "Whatever I have in the Special Interrogatories will go to the Court of Appeals. * * * "

* * * * *

Mr. Kelsey: "Our objection is to the interrogatories themselves, sir."

* * * * *

Mr. Kelsey: "Judge, we would ask you to omit interrogatory number 1 entirely because it concerns the stevedore's case which has been withdrawn from the jury and you now resubmitted it to the jury and as far as—well, if you would withdraw 1, Judge Hoffman, and give number 2 and number 3, and number 4, as they are without—without the thing you have given—if the question is answered in the affirmative the jury shall not answer question number 3. You haven't told the jury the verdict here. Doesn't—does not even let the jury render a verdict for the plaintiff. It only says, 'If you conclude that the plaintiff is entitled to recover, what amount is he entitled to recover?' "

The court then observed: "All right, Mr. Kelsey, stop beating around the bush.

■ Rule 49(a) of Fed.R.Civ.P. provides that the court may require a jury to return only a special verdict in the form of a special written finding upon each issue of fact. In that event the court may submit to the jury written questions susceptible of categorical or other brief answer, or may submit written forms of the several special findings which might properly be made under the pleadings and evidence; or it may use such other method of submitting the issues and requiring the written findings thereon as it deems most appropriate. The court must give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary to enable the jury to make its findings upon each issue. Section (b) of Rule 49 provides for a general verdict accompanied by answers to interrogatories and the court is empowered to submit to the jury a form for a general verdict for or against either party, together with written interrogatories upon one or more issues of fact, the decision of which is necessary to a verdict. In the case at bar, the jury was not instructed to bring in a general verdict either for or against either party but only to answer special interrogatories and no form of general verdict was provided for jury use. Therefore, the special interrogatories here must be treated as having been submitted pursuant to section (a) of Rule 49 which provides for fact finding.

■ A trial court has discretion in the use of special verdicts and this discretion is not limited to the decision with respect to such use but extends beyond to the form of the submitted interrogatories once such decision is made.[4] Although the court is vested with a wide discretion as to the form and substance of the interrogatories, all material factual issues should be covered by the questions submitted.[5] The number and form of issues, *if they present the case fairly,* are matters resting in the *sound discretion* of the trial judge.[6] Generally, Rule 49(a) permits submission of special interrogatories to juries on issues of fact, but if an issue presents a mixed question of fact and law it may be submitted if the jury is instructed as to the legal standards to be applied; the form of the special issues should be such as not to mislead or confuse the jury.[7]

In pertinent part, Rule 49(a) Fed.R.Civ.P. provides:

" * * * The court shall give to the jury such explanation and instruction concerning the matter thus submitted as may be necessary *to enable the jury to make its findings upon each issue.* If in so doing the court omits any issue of fact raised by the pleadings or by the evidence, each party waives his right to a trial by jury of the issue so omitted unless before the jury retires he demands its submission to the jury. * * * "

(Emphasis ours.)

Rule 51 Fed.R.Civ.P. provides as follows:

"At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error the giving

---

You have got your exception to the special interrogatory number 1. You say it shouldn't have been given but even if it should have been given it should have been given not as an interrogatory number 1."

4. McDonnell v. Timmerman, 269 F.2d 54 (8th Cir. 1959).

5. Angelina Casualty Company v. Bluitt, 235 F.2d 764 (5th Cir. 1956).

6. Norfolk Southern Ry. Co. v. Davis Frozen Foods, 195 F.2d 662, 666 (4th Cir. 1952); Mourikas v. Vardianos, 169 F.2d 53, 57 (4th Cir. 1948); Moore's Federal Practice (2d ed.), Vol. 5, p. 2206.

7. See Jackson v. King, 223 F.2d 714, 718 (5th Cir. 1955).

or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury."

In Clegg v. Hardware Mutual Casualty Co., 264 F.2d 152, 156–157 (5th Cir. 1959), the court said:

"The Insurer insists that Rule 51 has nothing to do with a special verdict. We would not agree. The use of a special verdict under Rule 49 frequently calls for explanatory instructions. Sometimes the explanatory instructions and the form of the issues have to be drawn with greater precision than for a general charge. [Cited cases omitted.] Indeed, Rule 49(a) works an automatic waiver of jury trial on any issue raised, but not submitted by the Court, 'unless before the jury retires [the party] demands its submission to the jury.'

\* \* \* \* \* \*

"As the matter goes to the assurance of a trial of substantial fairness, not technical perfection, the nature and time of the indication which the Court should give counsel, and the showing of harm from any supposed dereliction must be measured likewise in the same light of substantial justice. \* \* \*"

After the evidence was in and after adjournment on November 30, the day before the case was to be submitted to the jury, the judge met with counsel to discuss the issues and the court's proposed charge. It is clear from the record that the judge and plaintiff's counsel dis-

agreed as to what had transpired prior to that time. The judge insisted that counsel had been requested about two days earlier to prepare and submit forms of special interrogatories and stated that this request *had been dictated into the record.* Plaintiff's counsel were just as insistent that the court had asked only for the submission of requests for charge and not for interrogatories. From the transcript of proceedings on November 29, 1962, it appears that late in the afternoon, following an "off the record" discussion between court and counsel, the court stated:

"Let the record indicate that at the conclusion of today's hearing, the Court invited counsel to submit their *requested charges,* and counsel in due and proper form had no *charges* to submit at the present time. But, the Court directed them to all present them by 9 o'clock tomorrow morning in order to give the Court at least an opportunity to look through them before the case is concluded." (Emphasis ours.)

The record of proceedings on November 30 reveals that the court had then received from counsel for each side their written requests for charge and from counsel for the defendant forms of special interrogatories but none from plaintiff's counsel.

It affirmatively appears from the judge's charge to the jury that the special interrogatories submitted to the jury were not formulated or typed until the late afternoon of November 30 and after proceedings had been suspended for the day. Excerpts from a colloquy between court and counsel on the next day, December 1, are shown below.[8]

8. Mr. Kelsey: "Our objection is to the interrogatories themselves, sir."

The Court: "When did we discuss it?"

Mr. Kelsey: "You told us last night that you were going to give the same interrogatories which you had given in a previous case in your Court, or words to that effect, as I recall."

The Court: "Well, I told you I was going to follow the general theory of them

but they are not the same interrogatories if you have looked at them."

Mr. Kelsey: "I asked your Honor to give the same interrogatories as you gave in the—" (here counsel was interrupted by the Court).

\* \* \* \* \*

Mr. Kelsey: "It was my understanding after what you said last night that the Court would draw its interrogatories. I

■ Notwithstanding the various exchanges and obvious disagreements between court and counsel, it does appear that plaintiff's counsel made known to the court their objections to the form, substance and the order of submission of the interrogatories, as well as their objections to the court's charge and refusal to charge as requested. As the court said in Hager v. Gordon, 171 F.2d 90, 93 (9th Cir. 1948): " * * * It is no answer to argue that appellant could have asked that other forms of verdict be presented. The furnishing of proper forms of verdict was the province and duty of the Court."

■ The plaintiff's theory of recovery presented at least two primary liability issues, namely, unseaworthiness of the ship and negligence of the defendant, Isbrandtsen. It cannot be successfully urged or argued that the plaintiff was not entitled to a jury trial of these issues and not entitled to have the jury determine, from a preponderance of the evidence, whether the plaintiff's injuries were proximately caused by the alleged unseaworthiness, negligence or both. In fact, the court, in its charge to the jury, went further and explained:

> "If both Isbrandtsen and Company and Whitehall Terminal Corporation were guilty of concurrent negligence which proximately caused or proximately contributed to the accident, or if the vessel was unseaworthy, as I have attempted to define the term to you, and such unseaworthiness proximately caused or proximately contributed to the accident, and such unseaworthiness combined with an act or acts of negligence on the part of Whitehall Terminal Corporation, its agents or employees, in proximately causing or proximately contributing to the accident, then the plaintiff must recover."

Thus the court indicated that the jury could consider not only the ship's unseaworthiness and Isbrandtsen's negligence in arriving at a determination of proximate cause, but also any *concurrent* negligence on the part of the longshoremen which proximately caused or proximately contributed to the accident.

Here, there were multiple issues of fact to be resolved before reaching a determination of proximate cause and liability. The issue of plaintiff's contributory negligence was removed by the court after the evidence was presented. Isbrandtsen's principal remaining theory of defense was that the accident occurred as the result of the negligence of the stevedore, Whitehall, and that such negligence was the *sole* proximate cause. However, the plaintiff sought, albeit unsuccessfully, to have the jury decide an additional issue based upon the theory that the manner in which the cargo unloading operation was carried on by the longshoremen themselves created such a dangerous and hazardous condition as to amount to unseaworthiness for which the defendant would be liable. The court refused to submit such issue or to charge with respect thereto as requested by plaintiff but told the jury that if "the method of operation used in removing the cargo was the sole proximate cause of the accident, then the defendant is not liable."

We now turn to an examination of the form and substance of the special interrogatories. It is to be noted that Interrogatories Nos. 2 and 4 began with the word "Was." No. 2, if considered by the jury, would clearly present the question— "Was the S. S. Flying Endeavor seaworthy?" No. 4, if considered by the jury, would clearly present the question —"Was the defendant negligent?" Thus, Interrogatories Nos. 2 and 4 squarely submitted issues of fact for jury determination. However, at the direc-

---

would have brought some this morning if I thought—"

The Court: "Mr. Kelsey, don't stand there and give me that hogwash. Two days ago, and dictated into this record,

you will find where I said I wanted—I wanted the request for special interrogatories, I wanted the request for charges and that neither counsel had anything."

tion of the court, the jury never reached them.

The form of Interrogatory No. 1 is a significant departure from the form used in Nos. 2 and 4. No. 1 does not ask the jury—"Was Whitehall Terminal Corporation negligent in handling the bales of piece goods?" It commences with the word "If." There is a vast difference between "Was" and "If." In pertinent part, Webster's New International Dictionary, Second Edition 1961, defines the word "if" as follows:

> "1. In case that; granting, allowing, or supposing that;—introducing a condition or supposition, * * *. Conditional clauses introduced by *if* may be classified as expressing: (1) What the speaker assumes or admits as actual fact. * * * (2) What the speaker regards as contingent, and withholds endorsement from as fact. * * *
>
> (3) What the speaker regards as contrary to fact. * * * "

By the use of word "if," could the jury reasonably conclude that it was directed to assume or suppose that the plaintiff's employer, the stevedore, was negligent before proceeding to find the answer to the rest of the same interrogatory? Or was the jury given to understand that the court was admitting as an actual fact that Whitehall was negligent? An affirmative answer to either or both of these questions would indicate that there was no separate issue of fact with respect to Whitehall's negligence submitted for jury consideration.

And then to compound the confusion and uncertainty thus created, we find the following language: " * * * was such negligence, *without regard to unseaworthiness,* the sole proximate cause * * *?" (Emphasis supplied.) Was the jury thus directed to disregard all evidence with respect to alleged unseaworthiness concerning which the court instructed at length? In an effort to explain Interrogatory No. 1, the court charged that "we are dealing with the sole proximate cause" and that the jury

should not consider the other interrogatories unless Whitehall's negligence *was not* the sole proximate cause. We do not believe that this explanation served to remove the uncertainties inherent in the form of the interrogatory.

The question naturally arises—how could the jury be expected to determine that Whitehall's negligence was the "sole" proximate cause without considering and evaluating the mass of evidence introduced with respect to alleged unseaworthiness and defendant's negligence and rejecting, by a process of elimination, unseaworthiness and defendant's negligence as proximately causing or proximately contributing to the accident? If the effect of Interrogatory No. 1 was to require the jury to give blanket consideration to every issue raised by the pleadings and the evidence and to select therefrom only *one* suggested proximate cause to the exclusion of any and all other possibilities, the factual issues in the case were not fairly presented.

It was plaintiff's burden to prove by a preponderance of the evidence the unseaworthiness of the vessel or negligence of the shipowner as proximately causing or contributing to the accident. As the trial court pointed out to the jury, Scott's case was against the shipowner and not against his stevedore employer. Scott argues, and not without some justification, that by the manner in which his case against the shipowner was first submitted to the jury in Interrogatory No. 1, he was unfairly required to assume the extra burden of proving either that his fellow longshoremen were entirely free from negligence or that any negligence on their part was not the *sole* proximate cause of his injuries.

In Scarborough v. Atlantic Coast Line R. Co., 190 F.2d 935, at page 938 (4th Cir. 1951), this court had occasion to consider the submission of special interrogatories and said:

> " * * * Certainly it is desirable that questions should be simple and clear, with one single issue in each question. Double questions, or

questions in the alternative, should be avoided. * * * " 9

We cannot escape the conclusion that Interrogatory No. 1 was so vague, uncertain and so susceptible to different interpretations as to be confusing and misleading and that its submission deprived the plaintiff of the fair presentation of his case to which he was entitled.

In the last twenty years or more, the law in the field with which we are here concerned has undergone many significant changes. The case books are full of decisions of the inferior federal courts and may serve, in some instances, to illustrate a trend but accepting or following them as authoritative suggests a spirit of reluctance to heed the changes and is sheer folly. As precedent they may be here today and gone tomorrow. This is true of our own prior decisions as well as those of other courts. What the text writers present as an accurate exposition of the law applicable to a given set of facts may, to the dismay of a District Court or Court of Appeals which has relied thereon, prove to be completely untrustworthy. The changes in basic principles come with such rapidity and, in many instances, so unexpectedly that confusion and uncertainty result. In Gilmore and Black, "The Law of Admiralty (1957), Chapter 6, Rights of Seamen and Maritime Workers; Recovery for Death and Injury," § 6–5, n. 12, page 253, we find the apt statement:

> "The radical reconstruction of maritime personal injury law since 1940 has made much of the older case law of little more than antiquarian interest. The volume of personal injury litigation since 1945, and particularly since 1950, has been

so great that exhaustive citation of recent lower court cases would be an almost impossible task. These cases were decided against a rapidly changing background and many of them were of merely transitory interest; since the Supreme Court has claimed the field of maritime personal injury litigation as its own, lower court decisions have suffered from rapid technological obsolescence. Thus exhaustive citation to them would be fruitless and unhelpful. * * * "

To this statement we add our fervid "amen"!

It appears, however, to be now established beyond doubt that a shipowner's obligation to maintain a seaworthy vessel, traditionally owed by shipowners to seamen, extends to a longshoreman who is injured while aboard and loading or unloading the ship, although employed in that work by an independent stevedoring contractor engaged by the owner. For purposes of the liability for injury, a longshoreman is a seaman because he is doing a seaman's work, incurring seaman's hazards, and is entitled to a seaman's traditional protection.[10] Furthermore, the shipowner's duty to maintain a seaworthy ship is absolute and continuing;[11] it is not delegable[12] or to be escaped by turning over a part of the vessel to another.[13]

In the case at bar, there was evidence before the jury that the procedure used by the longshoremen in discharging the cargo was the usual and practical method employed in breaking down and working this type of cargo out of the stow for discharge and was reasonably safe. But there was other evidence to

9. Cf. Great American Insurance Company v. Horab, 309 F.2d 262 (8th Cir. 1962).

10. Seas Shipping Co. v. Sieracki, 1946, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099; Pope & Talbot, Inc., v. Hawn, 1953, 346 U.S. 406, 74 S.Ct. 202, 98 L.Ed. 143; Alaska Steamship Co. v. Petterson, 1954, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798; Crumady v. The J. H. Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 3 L.Ed.2d 413.

11. Mahnich v. Southern S.S. Co., 321 U.S. 96, 64 S.Ct. 455, 88 L.Ed. 561 (1944); Seas Shipping Co. v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099 (1946).

12. Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 427, 79 S.Ct. 445, 3 L. Ed.2d 413 (1959).

13. Alaska Steamship Co. v. Petterson, 347 U.S. 396, 74 S.Ct. 601, 98 L.Ed. 798 (1954).

the effect that it took two men to safely handle a bale as it was being rolled down to or toward the cargo net; that because some of the bales were standing on end between the forward bulkhead and beams which extended from port to starboard, there was room for only one man to work; that one man could not handle a bale with safety so as to either check or direct its fall; that an unsafe and hazardous condition resulted from going to such depth into the stow and creating the stairstep arrangement before undertaking to remove the top tier of the bales standing on end. Thus, it is apparent that the evidence was in conflict and that different inferences could reasonably be drawn therefrom.

Plaintiff's counsel urge, as they did below, the application to the case at bar of what they characterize as the "Grillea Doctrine" as expounded in Grillea v. United States, 232 F.2d 919 (2d Cir. 1956). In that case it was held that the negligent conduct of longshoremen in misplacing a sound hatch cover, free from defects, made the vessel unseaworthy as to a fellow longshoreman who was injured as a consequence. Judge Learned Hand wrote:

" * * * It may appear strange that a longshoreman, who has the status of a seaman, should be allowed to recover because of unfitness of the ship arising from his own conduct in whole or in part. However, there is in this nothing inconsistent with the nature of the liability because it is imposed regardless of fault; to the prescribed extent the owner is an insurer, though he may have no means of learning of, or correcting, the defect. * *" 232 F.2d 919, at 923.

In Crumady v. The Joachim Hendrik Fisser, 358 U.S. 423, 79 S.Ct. 445, 3 L. Ed.2d 413 (1959), the Supreme Court, by citing the Grillea case, appears to

have given at least tacit approval thereto and to the principle that stevedores themselves could render a ship *pro tanto* unseaworthy and make the vessel owner liable for injuries to one of them.

 It has long been recognized, and juries have long been instructed, that the ship and her owners are not *insurers* of the safety of the workers aboard the vessel. But Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), made it clear that claiming an unseaworthy condition as "transitory" would no longer provide a defense and that liability for a temporary unseaworthy condition is no less than the liability which attaches when the condition is permanent. It was so held notwithstanding the penultimate paragraph of the Court's opinion, as follows:

"What has been said is not to suggest that the owner is obligated to furnish an accident-free ship. The duty is absolute, but it is a duty only to furnish a vessel and appurtenances reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service. * * *" 362 U.S. 539, at page 550, 80 S.Ct. 926, at page 933, 4 L.Ed.2d 941.

The obvious trend of the Supreme Court decisions is toward providing ever increasing protection for crewmen, longshoremen and even others employed by independent contractors who may be called upon to work aboard vessels. Prior to the decision in Mitchell v. Trawler Racer, Inc., supra, this court had indicated the view that a transitory condition provided no basis for a suit for unseaworthiness.[14] Since Mitchell this court

14. See Ross v. Steamship Zeeland, 240 F. 2d 820 (4th Cir. 1957), where the court stated as dictum that a transitory condition is not a basis for suit for unseaworthiness but holding that where coil of

wire was left in place of danger for a period of eight or nine hours it did not create a "transitory condition."

See also Blankenship v. Ellerman's Wilson Line New York, Inc., 265 F.2d 455,

has held that the shipowner may be held liable for an unseaworthy condition though transitory and unknown to the ship's officers.[15]

Holley v. The Manfred Stansfield, 269 F.2d 317 (4th Cir. 1959), involved an appeal from a holding by Judge Hoffman [16] that recovery against the shipowner for the death of a longshoreman engaged in discharging vessel's cargo was precluded under Virginia law because of decedent's contributory negligence. The case was reversed and remanded for findings by the District Court on negligence in failing to provide a safe place to work and unseaworthiness. The cargo being discharged from the hold was potash which had solidified during the ship's voyage, and the decedent longshoreman was killed when a large block of potash fell on him from an "overhang" while he was operating a small bulldozer, known as a "payloader," which was provided by the stevedore. The overhang had been created by the operations of the decedent himself which were pursued contrary to his instructions. On remand, Judge Hoffman held that no showing of negligence had been established because of the lack of notice to the shipowner of the method of handling the cargo but that recovery could be had because of the unseaworthy condition created and brought into play solely by the action of the decedent although the award must be reduced by reason of decedent's contributory negligence.[17]

The defendant argues that the only permissible inference to be drawn from the evidence here was that the longshoremen themselves were negligent, and that the only permissible conclusion was that this negligence was the sole cause of the accident. In its brief the defendant states:

"In analyzing the testimony presented during the trial of this case, it is very clear that the sole proximate cause, the only proximate cause of the injury to Scott was the action of the longshoremen themselves. These men were in exclusive and complete control of the operation right from the start. The conditions which developed in the working area and prior to the occurrence of the accident, were created by these men. * * * In the course of this very simple, uncomplicated operation the accident occurred and Scott was injured. * * *

* * * * * *

" * * * There is nothing in the record to indicate that there was any change in this operation prior to or subsequent to the occurrence of the accident. *No complaints were made to the supervisory personnel of Whitehall, or to the vessel's officers, concerning the condition of the stow, the way the work was being performed, or the conditions under which the work was being performed,* by the longshoremen." (Emphasis added.)

In this circuit it is no longer open to question that evidence of the negligence of the longshoremen themselves in the performance of the ship's work and in their method of operation may present a factual issue as to wheth-

at page 457 (4th Cir. 1959), wherein Judge Soper for the court said:

" * * * and the courts have not as yet generally accepted the view that the obligation of seaworthiness has been so extended that a seaman [longshoreman] may now recover damages from the shipowner for injuries caused by the negligence of a stevedoring contractor contemporaneous with the use of seaworthy appliances whereby a condition of unseaworthiness is created. * * * "

Yet Judge Soper participated in the decision and approved the opinion in Grzy-

bowski v. Arrow Barge Co., decided in 1960 and cited in footnote 15, infra.

15. Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457 (4 Cir. 1963); Puerto Seguro Cia. Naviera, S. A. v. Pitsillos, 279 F.2d 599 (4 Cir. 1960); Grzybowski v. Arrow Barge Co., 283 F.2d 481 (4 Cir. 1960).

16. Holley v. The Manfred Stansfield, 165 F.Supp. 660 (D.C.E.D.Va.1958).

17. Holley v. The Manfred Stansfield, 186 F.Supp. 212 (D.C.E.D.Va.1960).

er an unseaworthy condition is created for which the shipowner may be held liable for injury to a longshoreman resulting from such condition. This is true even though the condition be transitory and without knowledge of the ship's officers. Furthermore, contrary to defendant's argument, in determining unseaworthiness no significance attaches to the fact that no one complained of the alleged unsafe condition. We point to two fairly recent decisions of this court (and cases cited therein), namely, Grzybowski v. Arrow Barge Co., 283 F.2d 481 (4th Cir. 1960), and Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457 (4th Cir. 1963). These cases were decided subsequent to the decision of the Supreme Court in Mitchell v. Trawler Racer, Inc., supra, 362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960), where a transitory slippery condition of the ship's rail was involved and it was held that a factual issue as to unseaworthiness was presented even though the condition was unknown to the ship's officers.

Somewhat to our surprise the defendant cites, with emphasis, the case of Knox v. United States Lines Company, 294 F.2d 354 (3d Cir. 1961), in support of its contention that no factual issue of unseaworthiness arises from the longshoremen's alleged negligent method of discharging the ship's cargo. The facts in that case bear some resemblance to the facts in the case at bar. In Knox the longshoremen had discharged heavy rolls of burlap by digging a hole, roughly in the shape of a "V", down into the stow to a depth of seven or eight feet. They then proposed to dislodge the top bales and guide them under manual restraint as gravity caused them to slide down the slope to the small cleared space below. Two or three rolls underneath the top rolls were accidentally dislodged and slid, uncontrolled, down the slope to the floor. One of them struck and injured the plaintiff longshoreman. The stevedore provided the "immediate supervision" of the operation. The trial judge submitted the case on special interrogatories but, over plaintiff's objection, charged the jury:

"If you find that the gang of longshoremen directly caused the accident by breaking down the rolls of burlap so as to create the risk of such an accident as actually occurred, the ship owner would not be held responsible for a temporary and transitory unsafe condition of which the ship's officers would have no adequate warning."

The giving of this instruction was held to be reversible error and the case was remanded to the District Court "for a partial new trial limited to the issue of *possible unseaworthiness caused by the manner of breaking down the stowage * * *.*" (Emphasis ours.) It is interesting to note the language of the Third Circuit with reference to the above quoted instruction:

"* * * On its face, this language covered and restricted liability for unseaworthiness resulting from 'a temporary or transitory unsafe condition.' We understand that, with respect to the condition created by the longshoremen, the case had been so presented as to focus the attention of the trial judge primarily upon the question of negligence in making the hold an unsafe place to work. Moreover, to the extent that he may also have considered unseaworthiness, our Cookingham [Cookingham v. United States, 184 F.2d 213, 3d Cir. 1950, cert. den. 340 U.S. 935, 71 S.Ct. 495, 95 L.Ed. 675 (1951)] decision seemed to justify the charge as given. However, Cookingham was in effect overruled, and just such a charge as this one was held to be reversible error, by the Supreme Court in Mitchell v. Trawler Racer Inc., supra [362 U.S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941]. Since the ship in the Mitchell case was held responsible for the slippery condition of a rail created in unloading cargo even though that condition had not existed long enough to afford the ship a reasonable opportunity to discover and correct it, the court below erred in charging that 'the ship own-

er would not be held responsible for a temporary and transitory unsafe condition of which the ship's officers would have no adequate warning.'" 294 F.2d 354, 359.

On retrial [18] the District Court, by agreement acting without a jury, found as facts that the method of stowage of the rolls of burlap was safe and proper and in that respect the vessel was seaworthy; that due to the narrow space in which plaintiff had confined himself, he was unable to avoid being struck by the roll of burlap when it became dislodged and that the height of the "V" was not a substantial factor in causing plaintiff's injury.

On a second appeal,[19] the decision of the District Court was affirmed on the ground that the Court of Appeals could not say that the findings of fact of the trial court were clearly erroneous or were not supported by evidence. Although the issues in these Knox cases were ultimately resolved by a factual determination as to proximate cause, the conclusion is inescapable that the Third Circuit recognized that there existed a question of fact, to be determined by the trier of fact, i. e., whether the longshoremen's negligent method of discharging the cargo, though unknown to the shipowner, created an unseaworthy condition.

In the instant case, because of the trial court's ruling as a matter of law that the plaintiff was free of contributory negligence, no issue in that respect was presented for determination by the trier of fact, but here there was a conflict in the evidence as to whether the method used in discharging the cargo (the removal of a large number of the bales stowed in the lower tier and the creation of the steep stairstep arrangement up to the topmost tier) created such an unsafe, though transitory, condition as to render the ship unseaworthy. The Supreme Court has made it abundantly clear that

there has evolved a complete divorcement of unseaworthiness liability from concepts of negligence.[20] The plaintiff requested the court to submit to the jury such an issue of fact as to unseaworthiness but, instead, the court instructed that if the jury believed that the longshoremen's method of operation used in removing the cargo was the sole proximate cause of the accident, the defendant was not liable.

Counsel who frequently appear in this court representing shipowners and stevedoring contractors consistently and earnestly urge retention of the view which was entertained by many courts in past years that what is characterized as mere operational negligence on the part of longshoremen resulting in injury to one of them will not create liability on the part of the shipowner. Naturally, shipowners resist any enlargement of their obligations to respond in damages for injuries aboard ship which, they contend, are already imposed beyond the point of reason and fairness. They argue that the longshoremen are amply protected by the Longshoremen's and Harbor Workers' Compensation Act which was designed to provide insurance benefits for injuries sustained during the course of their employment, regardless of fault or cause. However, when sued for damages because of injury to a longshoreman, the shipowner almost invariably impleads the injured man's employer, alleges negligence of the stevedore and breach of the warranty of workmanlike service, and seeks indemnity in event of an adverse judgment. The independent stevedore likewise seeks to defeat the longshoreman's recovery against the shipowner and thus avoid the possibility of having to indemnify the shipowner. In many instances the shipowner is fully and amply protected by express contractual undertakings of the stevedoring company to indemnify. We are not unmindful of the fact that the shipowner is not with-

18. Knox v. United States Lines Co., 201 F.Supp. 131 (E.D.Pa.1962).

19. Knox v. United States Lines Company, 320 F.2d 247 (3d Cir. 1963).

20. Mitchell v. Trawler Racer, Inc., 362 U. S. 539, 80 S.Ct. 926, 4 L.Ed.2d 941 (1960).

**128**

out protection in the event of a judgment against him for injury to a longshoreman if the negligence of the longshoremen creates a condition which is found to be unseaworthy and is the proximate cause of the injury. The shipowner may become liable to the longshoreman but the ultimate responsibility may rest with the independent contractor who has a duty to properly supervise the operations.

Following what we believe to be the present trend of decisions in litigation involving a shipowner's liability for unseaworthiness, we think the court's refusal to instruct the jury as requested was error. For the reasons herein stated, we hold that the plaintiff is entitled to a new trial.

Reversed and remanded.