Leighton BEARD

v.

ELLERMAN LINES, LTD., and The City Line, Ltd., Appellants,

v.

ATLANTIC AND GULF STEVEDORES, INC.

No. 13278.

United States Court of Appeals Third Circuit.

Argued Oct. 18, 1960.

Decided April 7, 1961.

Rehearing Denied May 31, 1961.

T. E. Byrne, Jr., Philadelphia, Pa., (Krusen, Evans & Shaw, Philadelphia, Pa. (Kirlin, Campbell & Keating, New York City, of counsel, on the brief), for appellants.

Milton M. Borowsky, Philadelphia, Pa. (Abraham E. Freedman, Freedman, Landy & Lorry, Philadelphia, Pa., on the brief), for appellee, Leighton Beard.

Francis E. Marshall, Philadelphia, Pa. (Davis, Marshall & Crumlish, Philadelphia, Pa., on the brief), for appellee, Atlantic and Gulf Stevedores, Inc.

Before McLAUGHLIN, KALODNER and HASTIE, Circuit Judges.

KALODNER, Circuit Judge.

The plaintiff, Leighton Beard, brought this civil action, founded upon the diversity jurisdiction of the District Court,[1] against the defendants, Eller-

1. Plaintiff is a citizen and resident of Pennsylvania; defendants Ellerman

Lines, Ltd. and The City Line, Ltd. are British corporations.

man Lines, Ltd. and The City Line, Ltd. ("Ellerman"), to recover damages for personal injuries sustained in the course of discharging cargo from the latter's vessel, S.S. "City of Calcutta". Beard was a longshoreman in the employ of Atlantic and Gulf Stevedores, Inc. ("Atlantic"), a concern performing stevedoring services for the vessel. Beard's complaint alleged unseaworthiness and negligence. Ellerman joined Atlantic as third-party defendant, alleging in its third-party complaint that Beard's injuries were the result of Atlantic's negligence in discharging the cargo and in using devices which were "dangerous and improper" in doing so. Ellerman sought indemnity from Atlantic, under their contract, in the event it was held liable to Beard.

The case was tried before a jury, terrogatories, in favor of Beard in his action against Ellerman, and against Ellerman in its third-party action against Atlantic. In its answers to the interrogatories the jury found the "City of Calcutta" was unseaworthy and negligent, and Atlantic without fault with respect to the accident which resulted in Beard's injuries. The District Court entered judgment in accordance with the jury's special findings in favor of Beard against Ellerman and in favor of Atlantic against Ellerman in the third-party proceedings. It later[2] denied Ellerman's alternative motions to set aside the verdict in Beard's favor or for a new trial.

Ellerman has appealed, asserting in sum that the evidence failed to establish unseaworthiness or negligence on its part; that the jury's finding that Atlantic was not negligent is inconsistent with its finding of negligence against Ellerman since if there was any negligence it was that of Atlantic; and that Ellerman is entitled to indemnity from Atlantic as "a matter of law", if we find that the record sustains a finding of negligence in the discharge of the cargo.

The District Court did not file an opinion and it is necessary for that reason to set forth the facts in some detail:

On July 1, 1955, the "City of Calcutta" docked at a pier in Philadelphia. In its cargo were bales of burlap which had been loaded aboard in India. The bales each contained 30 to 40 bolts of burlap, enclosed in a burlap covering. Each bale, weighing between 1,000 to 1,200 pounds, had been compressed under tremendous pressure and circled with four parallel one-inch steel bands fastened together with a patented clip or buckle. Sixty-three tons of the bales, consigned to New York, were stowed in the forward end of the hold, which, by reason of the shear of the vessel, extended out halfway into the square of the hatch; and 100 tons of the bales, consigned to Philadelphia, were stowed toward the after end of the deck. The bales were stowed on their flat in tiers to the same height, and there was no separation between them except for their markings.

Atlantic's longshoremen started discharging the cargo at about 1:30 P.M. They used what are known as bale or burlap hooks which consist of a metal ring to which six lengths of manila rope are attached. At the opposite end of each rope there was a special flat metal hook. Two of these hooks were inserted under two bands of each of three bales by four longshoremen, two on each side of the bales, and a fifth man put the ring on the cargo hook at the joined ends of the runners from the cargo winches and gave the signal for the draft to be hoisted. The draft was then moved out into the square of the hatch under the hammer of the boom, which was positioned over Philadelphia bales, and hoisted out of the hold, across the ship and then lowered onto the pier.

The first of the bales were removed from the center of the hatch and then the bales were moved out from the wings one row or tier at a time. The

2. Ellerman's motions were filed May 7, 1958 and orally argued on June 24, 1959.

The District Court's Order denying the motions was filed April 4, 1960.

New York bales were not touched. There was enough space between the top tier of bales and the underside of the 'tween deck for the longshoremen to walk into the wings, and as a draft was hoisted they retreated into them.

At about 4:30 P.M. (three hours after the unloading had begun) when two tiers of the Philadelphia cargo had been discharged, a draft of three bales was attached to a set of burlap hooks by the longshoremen. These bales were in a row in the offshore wing under the coaming with approximately 12 feet of space above. As the draft, in the course of its hoisting, neared the coaming of the main deck hatch the middle bands of one of the bales broke and when the entire weight of the bale was placed upon the other band it too broke, and the bale dropped onto the New York bales, bounced off, bounded across one-half of the hatch, then some 20 to 25 feet astern of the after coaming, and struck Beard, pinning him against the after bulkhead.

Beard was taken to the hospital where his right leg was amputated, first below the knee and shortly thereafter above the knee. He was 41 years old at the time.

The facts, as stated, are not in dispute, nor is there any question presented here with respect to the amount of the jury's award of damages to Beard.

There was considerable testimony at the trial, expert and otherwise, that it was the custom in Philadelphia to use bale hooks in discharging bales similar to the type here involved, known as "gunnies"; that the Safety Rules for the safe handling of cargo, prepared by the Philadelphia Marine Trade Association, and used by stevedore personnel in Philadelphia, approved this procedure.

There was also testimony, by way of deposition of Donald Quinn chief officer of the "City of Calcutta" that Quinn had observed the manner in which the vessel's cargo of bales of wool as well as the bales of burlap were being discharged by Atlantic's men and that "they were going very quickly"; that Quinn had told one of Atlantic's men "with a bit of authority" that he thought the use of bale hooks in discharging the bales of wool "was a dangerous way of discharging" and that he was informed "it was the custom of the port". Quinn also said that he had "explained" to Atlantic's men that "in India they get wire slings and put them around the bales so that each individual bale has a wire around it, and as they hold it tight, the wire tightens around it."

Quinn, however, did not direct Atlantic's men to discontinue their method of discharging the bales. There was expert testimony that the chief mate is responsible for the safety of personnel engaged in cargo operations and that his authority outranks the stevedore boss.

An expert metallurgist who had tested steel bands similar to those used here testified that in his opinion the particular bands on the bale that broke and struck Beard had "something wrong with the materials".

The foregoing presents the factual situation as presented to the jury.

On this appeal Beard contends that the jury's finding of unseaworthiness is amply supported for these reasons:

"Ellerman had actual and constructive knowledge that the burlap bales would be hoisted out of the hold by use of hooks inserted under the bands of the bales", and, "It was therefore charged with the absolute duty of supplying bands to permit that activity to be accomplished in reasonable safety"; in the instant case "the bands were inadequate", and the burlap bales created an unseaworthy condition because they were not capable of "being handled for the purpose of loading and discharge" by the bale hook method customary in Philadelphia.

Beard further contends that the jury's finding of negligence on Ellerman's part was supported by the testimony that Ellerman had failed to provide him with

a "safe place to work" in that (1) Ellerman breached its duty "to use reasonable care to ascertain the methods and manner in which the work was done and to forbid the use of a method which was hazardous to his [Beard's] safety" and the failure of the chief mate to take effective measures to prevent an unsafe method of discharging the burlap bales constituted negligence; further (2) Ellerman's "failure to discharge the New York bales in that port rendered the place of work unsafe and the defendant negligent", inasmuch as had the New York bales been dischargd in New York the bale which had dropped would "normally strike a flat surface and roll or bounce but a few feet", while here the dropped bale "bounced off and rolled all the way to the after bulkhead of the No. 1 hold, one-half the distance of the square of the hatch, and in addition, 20 to 25 feet underneath the after 'tween deck."

Atlantic's position is that the jury's finding, in answer to Interrogatory No. 4, that the "fault" of Ellerman did not "arise out of any failure" on its part, was supported by the evidence that its use of the bale hook method was customary and not negligent; that the jury's finding that Ellerman was negligent could properly have been premised on its failure to provide Beard with a "safe place to work" in that it had not discharged the New York bales at that port and they were so stowed that Beard was exposed in the discharging operation to the catapulting of the dropped bale which caused his injuries.

Atlantic contends that, for the reasons stated, the jury's finding with respect to it is not inconsistent with its finding that Ellerman was negligent.

The District Court, in its charge, dealt with the theories of Ellerman's negligence advanced by Beard.

On the score of the jury's finding, in answer to Interrogatory No. 2, that Ellerman was negligent, Ellerman[3] and

Atlantic both urge that the answer fails to disclose whether it was based on (1) use of the bale hook method in discharging the burlap bales; or, (2) failure of Quinn, Ellerman's chief mate, to stop Atlantic from pursuing the bale hook method of discharge which he had characterized as "dangerous"; or, (3) failing to provide Beard with a safe place to work in view of Ellerman's failure to discharge the New York bales at that port and their position with relation to the bales which were being discharged at the time of the accident.

Interrogatory No. 2 which presented to the jury the issue as to whether Ellerman was negligent reads as follows:

"Was there negligence on the part of Ellerman Lines, Ltd., which was a substantial factor in causing injuries to the plaintiff?"

The jury's answer to the interrogatory was "Yes".

In disposing of Ellerman's appeal from the jury's finding that its negligence "was a substantial factor in causing injuries to the plaintiff", we are required only to determine whether there was substantial evidence adduced at the trial with respect to any one of the three theories of negligence on Ellerman's part which measured up to the applicable standard of legal proof and thus permitted the jury's fact-finding that Ellerman was negligent.

On the score of whether the record affords a substantial basis for a finding that Beard's injuries were caused by *somebody's* negligence in the discharge of the burlap bales this extraordinary situation presents itself:

Both Ellerman and Atlantic do not really question that sufficient evidence was adduced in the record to establish that Beard was injured as a result of negligent conduct of the discharging operation; indeed they virtually concede that the record establishes such negligence—they only differ as to the nature of the negligent acts and with respect

---

**3.** Ellerman says: "It is impossible to tell what conduct by Ellerman was found to constitute the conclusion 'negligence' ".

as to who was guilty of the negligent conduct.

Says Ellerman, in its brief:[4]

"We dispute that Ellerman was negligent and assert rather that the negligence here was *solely* that of the stevedore [Atlantic]." (Ellerman's emphasis.)

That statement was made in consonance with Ellerman's position that Atlantic was in full control of the discharging of the cargo; it was an "expert in the field"; "It was Atlantic's method of pulling out the cargo, not Ellerman's"; "Ellerman would not be negligent for failing to either supervise or take over and itself perform the details of the work"; and, while Atlantic's negligence would make Ellerman liable to Beard, Ellerman was thereby entitled to indemnity from Atlantic under their contract for stevedoring services because of Atlantic's "sub-standard" performance.[5]

Atlantic, replying to Ellerman's contention here that the jury's finding of negligence on its part was inconsistent with its finding, in answer to Interrogatories Nos. 4 and 5, that Atlantic was free of·fault, made this statement in its brief:[6]

"Appellant [Ellerman] conveniently fails to acknowledge that other issues were submitted, *upon which the Jury could properly have found negligence on the part of the shipowner.* Plaintiff, through his counsel, contended that Ellerman was negligent in failing to provide Plaintiff with a safe place to work. Evidence was offered which established that certain New York cargo

was not removed at that port, was stowed in a position exposed to this unloading operation and was the very means by which the falling bale was catapulted against Beard. * * *

" * * * *  *The Jury could properly find and by its verdict undoubtedly did find that Ellerman was guilty of negligence in stowing the New York cargo with the Philadelphia cargo in the center of the hatch opening.*

"From the description of the accident by all the eyewitnesses, *it is clear that the accident would not have occurred had the falling bale not struck the New York cargo and rolled under the coaming against Beard."* (Emphasis supplied.)

In view of what has been said it is unnecessary for us to discuss in detail all the evidence relating to the issue of negligence. We have but to say that the record affords ample basis for the jury's finding that Ellerman was negligent.

For example, there was evidence that bands of bales "broke" in "roughly between 3 and 5 percent of the bales" during discharging operations.[7] It is true that there was considerable testimony, as earlier stated, that it was the custom in Philadelphia to use bale hooks in discharging burlap bales and that the method was approved by the Philadelphia Marine Trade Association, but as we held in Curtis v. A. Garcia Y Cia., Ltda., 1959, 272 F.2d 235, 237 "such custom, though it may be evidence of reasonableness, is not conclusive," and the jury may find, if there is sufficient basis in the testimony, that the customary method

---

4. Page 22 "Brief for Appellant".

5. In its third-party complaint against Atlantic, Ellerman averred that if it should be held liable to the plaintiff "then the third party is liable over" to it "by reason of" Atlantic's failure "to properly perform the work of unloading"; Atlantic *"was negligent in the manner in which it undertook to unload cargo"*; Atlantic "supplied and used devices in connection with the unloading * * * which were dangerous, improper and, in addition, violated the terms of the [stevedoring] agreement." (Emphasis supplied).

6. Pages 8–9 "Brief for Atlantic and Gulf Stevedores, Inc., Appellee".

7. Testimony of Captain William Wheeler, associated with a firm of marine consultants.

does "not satisfy the standard of reasonable care."

Further, there was testimony by Ellerman's own chief mate, Quinn, earlier referred to, that in his opinion the use of bale hooks "was a dangerous way of discharging", and that he had "explained" to Atlantic's man that in India, in handling burlap bales they used the sling method.

On the score of Quinn's testimony it must be said that his failure to take effective measures to stop the use of the discharge method which he condemned as "dangerous", would constitute negligent conduct for which Ellerman was liable in the event of a jury finding that the discharging procedure was in fact "dangerous", as he deemed it to be.

Also, there was testimony that those engaged in the task of discharging the bales were exposed to a hazardous situation, by virtue of the stowage of the New York bales with respect to the bales which were being unloaded, and thus were not afforded a "safe place to work", which is, of course, negligence on the part of those responsible. The testimony on this score, as earlier stated, was deemed ample by Atlantic, an expert in the field, to sustain a finding that Ellerman had failed to provide "a safe place to work".

■ It is settled law that Ellerman owed to Beard the obligation to provide him with a safe place to work, and its failure to do so constituted negligence.

■ It is equally settled that Ellerman was under a duty to use methods which complied with the standard of reasonable care in the discharge of its cargo, and to forbid the use of a discharge method by the stevedore of its selection which did not conform to a standard of reasonable care.

"The work of loading and unloading is historically 'the work of the ship's service'", as the Supreme Court said in Crumady v. The Joachim Hendrik Fisser, 1959, 358 U.S. 423, 79 S.Ct. 445, 447, 3 L.Ed.2d 413.

Whatever inconsistency Ellerman sees in the jury's answers to Interrogatories Nos. 2 (in which it was held negligent) and 4 (in which Atlantic was absolved from liability over to Ellerman), it is not one which aids Ellerman in Beard's action against it. In answering Interrogatory No. 2, the jury was determining the issue of negligence between Beard and Ellerman. In answering Interrogatory No. 4, the jury was determining, necessarily, the contractual obligation of Atlantic to Ellerman. The issue for us on appeal with respect to this Interrogatory is whether as a matter of law Atlantic can be relieved of its contractual obligation in any circumstance of this case. The fact, that the jury believed either that the contractual obligation of Atlantic to Ellerman did not coincide with the duty of Ellerman to the plaintiff, or that Atlantic properly discharged its contractual obligations, if erroneous, would not require that we reverse the finding of liability as between the plaintiff and Ellerman, if that finding is supported by the evidence, as we have found that it is.

What has been said brings us to Ellerman's contention that if it "is liable to Beard upon a theory of negligence * * * the undisputed evidence required the District Court to enter * * * judgment in Ellerman's favor [against Atlantic] because it was clearly Atlantic's action which brought about the result and clearly it constituted a breach of a warranty of workmanlike service."

Our consideration of Ellerman's contention is controlled by the principles recently summarized in Waterman S. S. Corp. v. Dugan & McNamara, Inc., 1960, 364 U.S. 421, 423, 81 S.Ct. 200, 201, 5 L.Ed.2d 169, as follows:

"In Ryan [Stevedoring] Co. v. Pan-Atlantic [S.S.] Corp., 350 U.S. 124 [76 S.Ct. 232, 100 L.Ed. 133], it was established that a stevedoring contractor who enters into a service agreement with a shipowner is liable to indemnify the owner for damages sustained as a result of the stevedore's breach of

his warranty to perform the obligations of the contract with reasonable safety. *This warranty of workmanlike service extends to the handling of cargo, as in Ryan, as well as to the use of equipment incidental to cargo handling,* as in Weyerhaeuser S.S. Co. v. Nacirema [Operating] Co., 355 U.S. 563 [78 S. Ct. 438, 2 L.Ed.2d 491]. The warranty may be breached *when the stevedore's negligence does no more than call into play the vessel's unseaworthiness.* Crumady v. The J. H. Fisser, 358 U.S. 423, 429 [79 S. Ct. 445, 448, 3 L.Ed.2d 413] \* \* \*." (Emphasis supplied).

■ Application of the principles stated to the indemnity action compels the determination, under the particular facts here and the jury's finding with respect to Ellerman's negligence, that Ellerman is entitled to indemnity from Atlantic as a matter of law.

As already pointed out, the record affords ample basis for a jury fact-finding that (1) use of the bale hook method in the discharge of the burlap bales constituted negligence, and (2) that the injured longshoreman was not afforded a safe place to work.

Atlantic suggests that the jury's finding that Ellerman was negligent was based on its failure to provide a safe place to work in view of the fact that the New York cargo "was stowed in a position exposed to this unloading operation and *was the very means by which the falling bale was catapulted against Beard*", and says that *"the jury could properly have found negligence on the part of the shipowner"* in this situation, and *"it is clear that the accident would not have occurred had the falling bale not struck the New York cargo and rolled under the coaming against Beard."* (Emphasis supplied.)

Atlantic hoists itself on its own petard in stating that the evidence established that the New York stow, as positioned when the Philadelphia bales were being discharged, created an unsafe place to work.

Under the principles above stated, the "warranty of workmanlike service to perform the obligations of the contract with reasonable safety", extends to the handling of the cargo, and thus if it was negligence on Ellerman's part to permit Beard to work in an unsafe place, it was equally negligent for Atlantic to "handle" the cargo in the unsafe place to work.

It was Atlantic's conduct in proceeding to unload cargo in an unsafe place to work which "called into play" the unsafe condition which prevailed, and under Crumady v. The Joachim Hendrik Fisser, supra, it breached its warranty to Ellerman.

What was said in American President Lines, Limited v. Marine Terminals Corp., 9 Cir., 1956, 234 F.2d 753, 759, 760, certiorari denied 352 U.S. 926, 77 S.Ct. 222, 1 L.Ed.2d 161, is significantly applicable here:

" \* \* \* We are not concerned here with a situation in which the stevedore's breach of duty brings about the injuries by operation upon a prior condition caused by the shipowner's negligence which is unknown to the stevedore. Here the stevedore was fully informed of the fact and of the possible consequences of the shipowner's negligence \* \* \* and in face of all that proceeded to breach its duty so as to make that negligence an immediately dangerous force \* \* \* [I]t was the stevedore's breach of duty that created the danger and made it an active condition with immediately foreseeable consequences of personal injury."

The "expertise" of Atlantic in the handling of cargoes should have made it aware of the dangers inherent in the discharge of the Philadelphia bales in view of the presence of the New York stow. If a jury could "properly find", as Atlantic urges, that Ellerman was negligent in permitting the discharge under the circumstances which prevailed, because of their obvious dangers, it certainly follows that Atlantic, an expert

in the field of handling cargo, should have shown an awareness of the situation and taken steps to avoid that which happened or refused to proceed with the discharge of the cargo until the site of discharge was made "a safe place to work."

It must here be noted that the District Court in its charge to the jury with respect to the indemnity action failed to instruct it that if Atlantic carried on the discharge of the Philadelphia bales in a place unsafe to work that it was guilty of a breach of its "warranty [to Ellerman] to perform the obligations of the contract with reasonable safety."

The District Court erred in this respect and to its error may be attributed the fact that the jury, in its answer to Interrogatory No. 4 acquitted Atlantic of "any failure * * * to do its work in accordance with its contractual obligation."

Further, in its charge to the jury the District Court prescribed the "criterion", as it put it, of Atlantic's performance of its contract, as follows:

"You will have to decide whether or not there was an unreasonable discharge of this cargo, an unsafe method used in the discharge of this cargo, in the placing of the hook."

The phrasing of this instruction was such that it made the sole "criterion" of the jury's test as to whether Atlantic had breached its contract of "workmanlike service" in the use of the bale hook method in discharging the cargo.

The error of this instruction, as well as the error committed when the District Court failed to instruct the jury that it was a breach of Atlantic's contract to carry on the discharging operation in an unsafe place to work, was further compounded by a last-minute instruction to the jury, following conclusion of the charge in chief, and just before the jury retired. The instruction referred to follows:

"If you find that Atlantic & Gulf Stevedores, Mr. Marshall's client, was unloading the bales in a proper and safe manner, *using a method that was in accordance with the practice, customs, and usage in the Port of Philadelphia,* and that that was not in violation of their breach of contract which obtained between them, *then your verdict must be in favor of the Atlantic & Gulf Stevedores.*" (Emphasis supplied.)

It may be noted that exception was taken to this instruction by Ellerman.

In summary, we are of the opinion that the testimony adduced afforded ample basis (as Atlantic itself says) for a jury finding that the discharge of the Philadelphia bales was carried on in an unsafe place to work and while that finding made Ellerman liable to Beard it also made Atlantic liable, as a matter of law, to Ellerman for indemnity for its breach of warranty as previously detailed.

The opinion stated makes it unnecessary for us to consider the issue of unseaworthiness [8] which was premised on Beard's view that the doctrine of unseaworthiness extends to the packaging of the ship's cargo;[9] and that the cargo in the instant case was "unseaworthy" by reason of the "inadequacy" of the steel bands used to bind the burlap bales.

For the reasons stated the judgment of the District Court in favor of the plaintiff Leighton Beard and against the defendants, Ellerman Lines, Ltd. and The

---

8. Hudgins v. Gregory, 4 Cir., 1955, 219 F. 2d 255.

9. It may be noted that plaintiff relies in this respect on the holding of the Second Circuit in Reddick v. McAllister Lighterage Line, Inc., 1958, 258 F.2d 297, at page 299, certiorari denied 358 U.S. 908, 79 S.Ct. 235, 3 L.Ed.2d 229, where it was said:

" * * * the holding of unseaworthiness may also be predicated on the latent defect in the cargo-crate". But see Carabellese v. Naviera Aznar, S.A., 1960, 285 F.2d 355, 360 where the Second Circuit limited Reddick to its particular facts and said it was "not disposed" to extend the doctrine of unseaworthiness to include "cargo * * * safe to handle".

City Line, Ltd. will be affirmed, and the judgment in favor of the third-party defendant, Atlantic & Gulf Stevedores, Inc. and against the third-party plaintiff, Ellerman Lines, Ltd. and The City Line, Ltd. will be reversed, and the cause remanded with directions to the District Court to proceed in accordance with this opinion.