**Norris EVANS, Jr., Plaintiff,**

v.

**OVERSEAS MARITIME CO., Inc., Defendant and Third-Party Plaintiff,**

v.

**CAROLINA SHIPPING COMPANY, Third-Party Defendant.**

**Civ. A. No. 69–417.**

United States District Court, D. South Carolina, Charleston Division.

Oct. 27, 1970.

---

Harvey M. Spar, Charleston, S. C., for plaintiff.

B. Allston Moore, Jr., Charleston, S. C., for Overseas Maritime Co., Inc.

Charles H. Gibbs, Charleston, S. C., for Carolina Shipping Co.

## ORDER

SIMONS, District Judge.

On July 18, 1968, at approximately four o'clock in the afternoon, Norris J. Evans, Jr., a longshoreman employed by the third-party defendant, Carolina Shipping Company, sustained a very serious injury when a bale of cotton piece goods fell back into the hatch of the vessel upon which he was working and struck him, as it was being lifted out of the hatch. As a result of the accident, he was permanently injured, and he brought an action in Admiralty against the owners of the vessel, alleging negligence and unseaworthiness. Defendant Overseas Maritime Co., Inc., hereinafter known as the Shipowner, brought a Third-Party Complaint against Carolina Shipping Company, hereinafter known as the Stevedore, alleging that the injury to the plaintiff was caused solely by the breach by the Stevedore of its contract to perform its work aboard the vessel in a workmanlike and non-negligent manner. The Stevedore thereupon counterclaimed against the Shipowner, and demanded reimbursement of its lien for compensation and medical payments.

Prior to the trial of the case, the Shipowner settled the case against it by paying to the Plaintiff the net sum of $137,-500.00, and by assuming payment of the subrogation claim of Carolina,[1] or its underwriter, in the event it became due. Carolina has agreed that the amount paid to the Plaintiff was a reasonable one.

The Shipowner then proceeded against the Stevedore on its indemnification claim, and with the issues thus joined, the case was tried before me without a jury in Charleston on June 15–17, 1970. A number of witnesses testified in person, there was deposition testimony from the Chief Officer and the Bosun of the Shipowner's vessel, and there were entered into evidence a great many exhibits, including photographs, various bills of lading and shipping orders, vessel's documents, and other exhibits. Subsequent to the trial, I have been furnished with Proposed Findings of Fact and Conclusions of Law by counsel for each party. I make the following Findings of Fact and Conclusions of Law in compliance with Rule 52 of the Federal Rules of Civil Procedure:

### FINDINGS OF FACT

1. The vessel involved in the case is the SS PACIFIC TELSTAR, a Victory Ship, with five hatches. A general cargo vessel, her crew was entirely Chinese. During the month of May 1968, the ship loaded cargo in five Far Eastern ports: Pusan, Kobe, Nagoya, Shimizu and Yokohama, in that order. Her ports of discharge, in the order in which reached, were Cristobal, New York, Baltimore, Wilmington, and finally, Charleston. From Charleston, the ship was scheduled to proceed empty to Galveston, Texas, and there to commence loading for her return voyage to the Far East.

All of the cargo consigned for discharge in Charleston was loaded into the No. 2 and No. 3 hatches of the ship. The Charleston cargo totaled 276.5 long tons, and it consisted of bales of cotton piece goods, and some general cargo. All of the Charleston cargo was loaded aboard the ship in the Port of Pusan.

2. This case concerns the bales of cotton piece goods which were stowed in the lower hold of Hatch No. 2. The uncontradicted testimony of the ship's Chief Officer was that the bales were offloaded from a barge in Pusan into the lower hold of No. 2. The longshoremen there used rope slings to effectuate the transfer, and then stowed the bales in the hold by hand. No hooks were used. The cargo occupied the after half of the hold, from about midway in the square of the hatch, and was stacked in tiers. The bales themselves, according to the bills of lading and the shipping orders, varied both in size and in weight, but they were all uniformly covered with burlap, and each bale was encompassed by five or six bands or straps. The average weight of the bales in each bill of lading varied from approximately 239 lbs. to approximately 481 lbs. The bands or straps around the bales were largely identical: They were made of steel, and according to one of the Stevedore's expert witnesses, who tested several of them, they were approximately one inch wide and varied in thickness from .0367 to .05 inches. Each strap was equipped with a heavy metal buckle, which was closed on one end, and open on the other. The straps were apparently put around the bales when they were in compress, and the expansion of the bale itself tightened the straps around the bale, when released. Each end of the strap went through the buckle, one on the closed side and the other on the open, and folded back under itself, where it was held tight by the pressure of the bale. Following the accident referred to, several bands were picked up off of the pier, and these were introduced into

1. The evidence at the time of trial indicated the amount of the Stevedore's subrogation claim was the sum of $25,368.28. It has been stipulated by counsel for the parties subsequent to trial that the correct amount of such subrogation claim is $25,663.28.

evidence. It is apparent that some of the bands had been reconditioned prior to their being put around this particular cargo. The reconditioning consisted of clamping tightly together, with a metal clamp, the previously broken ends of the strap.

A total of 581 bales, weighing 98.8 long tons, was loaded into the No. 2 lower hold in Pusan. The Chief Officer inspected the stow after the loading had been completed, and testified that there were no loose straps lying on or about the cargo. In the succeeding loading ports additional cargo consigned to Cristobal, New York and Baltimore was also placed in Hatch No. 2. The ship then proceeded on her voyage and when she arrived in Charleston on the morning of July 18, 1968, the only cargo left aboard the ship was in Hatch Nos. 2 and 3, and it was all consigned to Charleston.

3. Carolina Shipping Company was the stevedoring concern employed by the owners of the ship to discharge the cargo. One of its officers testified that in the year and a half preceding that date, ten ships belonging to Overseas Maritime Co., Inc., alone had discharged a total of 18,462 bales, weighing 3,466 long tons, of cotton piece goods in Charleston. It was thoroughly familiar with the discharge of this particular type of cargo.

At approximately 1:00 P.M., two gangs of longshoremen employed by Carolina went aboard the vessel and opened up Hatch Nos. 2 and 3. At approximately 1:40 P.M., according to the ship's log book, the actual discharge of the cargo commenced. In the gang working Hatch No. 2, there were 16 men: A header, two winch operators, a hatch tender, three men in the hold, and nine men on the pier. In addition, there was a ship foreman, Fred Matthews, also employed by Carolina, to exercise general supervision over the work being performed on the vessel.

4. Carolina was subject to the "Safety and Health Regulations for Longshoring" issued by the United States Department of Labor. In addition to the general provisions applicable to all stevedoring, three specific provisions of the Safety Regulations applied to the work being performed aboard the SS PACIFIC TELSTAR, a violation of any one of these by the Stevedore was sufficient to render the ship unseaworthy and result in a breach of Carolina's contract of workmanlike performance, if injury resulted:

Section 1504.66(b). Loads shall be applied to the throat of the hook since loading the point overstresses and bends or springs the hook.

Section 1504.81(a). Drafts shall be safely slung before being hoisted. Loose dunnage or debris hanging or protruding from loads shall be removed.

(e) Bales of cotton, wool, cork, wood pulp, gunny bags or other similar articles shall not be hoisted into or out of the vessel by their straps unless the straps are of sufficient strength to support the weight of the bale and two hooks, each in a separate strap, are used.

These provisions are binding upon both shipowner and stevedore, and have the force of law. Provenza v. American Export Lines, Inc., 324 F.2d 660, 665, 1965 A.M.C. 2279, 2286 (4 Cir. 1963).

5. The expert testimony before the court establishes that there are four principal methods generally employed by stevedores to discharge baled cotton goods: (a) By the use of pallets or skids, by which the bales are placed upon small wooden platforms and a sling arrangement lifts the pallet itself, with the bales upon it, bodily out of the hold; (b) by the use of rope slings, by which a long rope is wound around several bales and is then attached to the cargo hook at the end of the cargo runner, which lifts the sling, with the bales enclosed within it, out of the hold; (c) by the use of rope nets, by which a number of bales is rolled upon a large net, the corners of which are then drawn up and secured to the cargo hook, which

then lifts the net, with the bales enclosed within it, out of the hold; and (d) by the use of bale hooks or running hooks.

It is the custom in the Port of Charleston to discharge bales of cotton piece goods by the use of the bale hook method, and that method was used aboard the SS PACIFIC TELSTAR. By this method, the bales are lifted out of the hold of the vessel by hooks which are placed under their straps. For each outgoing draft of cargo, from two to four "ring ropes" would be used; each ring rope was equipped at one end with a ring; on the other end, through a loop, were three additional loops of rope; on each of those loops, there were two hooks, so placed on the loops that the points were facing toward each other; those two hooks would be inserted under two straps of a particular bale. Using this method, three bales could be lifted out of the hold if one ring rope was used; six if two ring ropes were used, nine if three were used, and so on.

The actual hooks themselves were manufactured by Carolina, and had what one witness referred to as a chisel type point on them. The ring ropes themselves were rigged by Carolina. The longshoremen generally testified that they had been trained in the use of this method and that the proper way to discharge a bale by it was to insert the two hooks under two different straps, but with one strap in between them; the hooks should be inserted so that the points faced each other; the hooks should be placed on the same side of the bale, under straps which were near the middle, rather than the end; the hooks should not be inserted under the buckles of the straps, or adjacent to them; the straps were generally so tight around the bales, that hammers had to be used by the longshoremen to drive the hooks under them.

All of the witnesses agreed that the bale hook method of discharging baled cargo was the fastest and the most economical. Carolina's stevedoring superintendent, Harry G. McCall, testified that approximately 10 to 12 tons per hour could be discharged by the use of pallets or rope slings; 15 to 18 tons with nets; and 25 or more an hour by the bale hooks.

6. The discharge of the cargo from the No. 2 hold began shortly after 1:30 P.M., and continued without interruption until Norris Evans was injured about 4 o'clock. The testimony as to the details of how it progressed can only be characterized as conflicting. Of the 16 members of the gang, Norris Evans, two hatch tenders and two holdmen testified for the Shipowner, in addition to the vessel's Chief Officer and Bosun; the Stevedore had testimony from the gang header, the two winch operators, a holdman and the ship foreman. Taking the testimony as a whole, and relying generally upon those witnesses who appeared to be most forthright and intelligent, I make the following general findings of fact with respect to the period of time before the accident occurred: When the gang first went into the lower hold, it found the cargo of baled piece goods in approximately the same or similar condition as it was when loaded in Pusan; there were few, if any, loose straps lying on and about the bales; there was some dunnage remaining in the hold from previous discharges of cargo from the hatch; the longshoremen discharged the bales that were stowed in the square of the hatch first, and then began removing the remaining cargo from the wings of the hold. At this point, the discharge of a particular draft of bales occupied two distinct phases: First, in order to get the bales out from the wings, the longshoremen had to hook them up and drag them out into the square of the hatch over the top of the remaining cargo; when they did so, it was inevitable that the bales, usually 9 to a draft, would be jumbled together and in some confusion as they were dragged out. During this process, it was inevitable that unequal strains would be put upon their straps, and some of the straps from some of the bales would come apart or would slip off, or possibly would break. When this oc-

curred, the longshoremen were instructed by the Stevedore to re-insert the hooks under different straps, trying to make certain that there were always two hooks to each bale; sometimes, because of the inaccessibility of bales in the middle of the draft, their hooks could not always be re-inserted. The straps that came loose from the bales during the process of dragging them out of the wings most probably either slipped out of the open end of the buckle, or, because of the placement of the hooks, pulled out of the buckle itself, their ends not being clamped down. Apparently, no attempt was made by the Stevedore to determine why the straps were coming off and no one looked at a particular loose strap to determine what had caused it to come off the bale.

The second phase of the discharge of a particular draft normally occurred when the bales had been dragged out from the wing and into the square of the hatch, and the longshoremen had attempted to re-insert any hooks that had come loose from the bales during that process. The draft was then ready to be lifted up and out of the hold. The same winch "wire" that had dragged it out would lift it up, and the inshore "wire" would pull it across the deck of the ship to a point where it was over the spot on the pier where the draft would be discharged. It would then be lowered to the pier, and the longshoremen working there would disengage the hooks from the bales, place the bales on pallets with "clamp" trucks, and then remove the pallets to the warehouse. The actual lifting of the bales from the hold was obviously the most dangerous phase, from the standpoint of the longshoremen working there. It was the stevedore's duty, according to its own experts, to make certain that those men were in positions of safety when the draft began to go out. In fact, the testimony from the hatchtenders was that it was their duty to see that the men were not standing in the square of the hatch when the draft was being lifted. If, during this phase, the longshoremen on the pier had not yet disposed of the previous draft of bales, the outgoing draft would be "held" over the deck, until the pier was ready for it.

During the course of the discharge of the bales prior to 4 o'clock, I find that at least one bale fell back into the hatch from an outgoing draft; at least one bale, and probably two or three bales, fell on to the deck of the ship, in the vicinity of the hatch tender; the hatch tender himself, Roger McDaniel, upon the advice of one of the winchmen, moved from his normal position, which was on the main deck between the coaming of the hatch and the side of the vessel, to a point aft of the hatch opening, in the vicinity where the winch operators themselves were stationed, because of the danger of falling bales. At least one bale fell on to the pier from a draft that was being lowered to it. The stevedore did not examine any of the straps from any of these particular bales to determine what had caused them to give way; and there is no testimony whatever as to whether they slipped off of the bales, came loose from their buckles, or broke. Also during this period, loose straps began to appear in the hold of the vessel, on the deck of the vessel and most noticeably, on the pier itself.

7. In reference to the accident in which Evans was injured, I find that one bale, weight and size unknown, fell back into the hatch from about the center of an outgoing draft, just as it reached the coaming of the hatch. The hatchtender testified that he heard one loud "pop", but all of the others, including the winch operators, heard no sound, the hatchtender himself, one of whose functions was to warn the men in the hold of just such an occurrence, had stepped away from the hatch and was proceeding to the side of the ship in order to determine whether the particular draft could be lowered to the pier. As the bale fell, one of the winch operators yelled down to the men in the hold; the falling bale either struck Norris Evans a glancing blow and knocked him into the midship's

ladder, near which he was standing, or it fell to the deck of the hold and bounced and knocked him into the ladder. After he had been taken from the hold, the ship foreman, Mr. Matthews, examined the bale, and found that two of its straps were missing. The straps themselves were never examined, either because no one looked for them, or because they could not be identified from among the others that were lying in the hold. From the record there is no way to tell whether either or both of the straps slipped off of the bale, came loose from their buckles, or broke. The bale may have been a "hobo" bale, one from which the hooks had become disengaged during the process of dragging it from the wings, and because of its position in the center of the draft, had not been rehooked, and was being given a "free ride" out of the hold.

8. Shortly after the accident attorneys and investigators representing both the Stevedore and the Shipowner arrived at the scene, and a number of photographs were taken by them, all of which were introduced into evidence. The photographs, all of them Polaroid snapshots, were random views of the hold of the vessel, the pier where the bales were landed, and the bales of cotton as they were actually hooked up. The testimony revealed that the photographs were fair representations of the scenes that they portrayed, and the way in which the bales were being discharged. From viewing the photographs, including those of the Shipowner's and Stevedore's, the following observations are made: There were bales on the hoist, and on the pier, with some of their straps missing; some bales had loose straps with a clearly defined loop showing beneath the bales; other bales were visible with at least one of their straps missing; other bales were shown with at least one of their straps crossed over the others, presumably either broken or having come apart; two photographs pictured outgoing drafts with loose straps dangling down from them; other photographs showed hooks inserted under the straps in the wrong direction: That is to say, with both hooks pointed in the same direction, requiring that one of the hooks be twisted. The photographs also showed that the ends of the hooks were directly under the straps on some of the bales, rather than having the throats of the hooks under the straps on some of the bales the hooks had been placed under or very close to the buckles of the straps, and there were some of the bales on which the hooks had been placed on opposite sides, rather than on the same side. One of the pictures showed a bale which was being hoisted by only one hook, and several of the photographs showed loose straps lying about in the hold, on the deck of the ship, and on the pier.

These photographs taken very soon after the accident and during the same unloading operation established that Carolina's longshoremen were not always abiding by the instructions of the Stevedore in reference to the proper placement of the hooks. From the number of loose straps shown by the photographs to be lying in the hold and on the pier, and particularly from observing the bales which had already been discharged, it is reasonable to assume that the Stevedore should have realized that the use of the bale hook method of discharge was causing the straps to come off of the bales. It is further significant that neither before nor after the accident did the Stevedore make any attempt to determine why, or to change his method of unloading the cargo.

9. The burden is upon the Shipowner to prove by the preponderance of the evidence that the Stevedore breached its contract of workmanlike performance. The Shipowner's expert, a stevedoring superintendent in the Port of Norfolk with wide experience in the handling of cargoes such as this, testified that in his opinion the straps around the bales were of improper construction for use as lifting devices, because of their open-ended buckles and because there were no clamps to tie their ends together. He expressed the further opinion that the

Stevedore's hooks were improper for this type of discharge, because they were so placed on their ropes that their points turned inward, rather than outward, as they should have been. He also testified that of the four methods of discharging baled goods, the bale hook method, though the fastest and most economical, was certainly the least safe method, because it utilized the straps around the bales themselves, over which the Stevedore had no control, while the other three methods made no use of any part of the bale itself as a part of the method of discharge. He stressed that the primary purpose of the straps around the bales was to hold the bales together, and that any other use of the straps was secondary to it. I find that the method which uses the straps themselves as lifting devices necessarily constitutes more danger to the longshoremen than the other three methods of discharge, which rely upon no part of the bale.

In its defense, the stevedore takes the position that the discharge of the cargo by the baled hook method was the method overwhelmingly used in Charleston, Wilmington and Norfolk, and that it was the customary and usual method; that the actual discharge of the cargo from the SS PACIFIC TELSTAR did not materially differ from the discharge of any other like cargo; and that the accident which befell Norris Evans resulted solely from a latent defect in the straps or straps around the particular bale which struck him, over which the Stevedore had no control and no prior notice. Its experts, from Wilmington and from New York, testified that the bale hook method was the one universally used, because it was the fastest, most economical and safest; that the straps around the bales themselves were of more than sufficient strength to support the weight of the bales, as required by the Safety Regulations; that the gear used by the Stevedore, including the ropes and the hooks, were entirely proper; and that the Stevedore's longshoremen had properly used them.

10. I find from the clear preponderance of all of the evidence that Carolina Shipping Company breached its implied contract to perform its discharging operation aboard the SS PACIFIC TELSTAR in a workmanlike and non-negligent manner, and I further find that Carolina Shipping Company has failed to prove that the strap or straps around the particular bale contained latent defects. It is clear, and the Shipowner admits, that the use of the bale hook method is the widely accepted method of discharging this type of cargo. It is axiomatic that the Safety Regulations would not have included Section 1504.81 (e) had they not presupposed that the straps around baled cargo would be used as lifting devices. The primary purpose of the strap, however, is to hold the bale together, and if it is to be used as an integral part of the method of discharge, then it must be proper and adequate for that use; and it is incumbent upon the Stevedore to make certain that the straps can be safely used. In the two and one-half hours prior to the accident, however, Carolina Shipping Company had actual notice that some of the straps around some of the bales were coming loose, or coming apart, or breaking, and yet it made no effort to determine what was wrong. As stated by the District Court in the case of Reed v. Bank Lines, Ltd., D.C., 285 F.Supp. 808 (1966), an Eastern District of Louisiana case:

> "The mere fact that there may be a long accepted or customary practice for longshoremen of a given stevedore to pull on bands with hand hooks, is not an excuse when it is an improper or unsafe practice, as in this case."

See also Beard v. Ellerman Lines, Ltd., 289 F.2d 201 (3 Cir. 1961), and Curtis v. A. Garcia Y. Cia, Ltd., 272 F.2d 235 (3 Cir. 1959).

During the same period of time, at least three bales had dropped from outgoing drafts, with the obvious inference that if the bales had been hooked up properly, then something had happened to both straps around each bale; yet it

made no attempt to determine what had happened to those straps. Its failure to investigate the reason for these occurrences constituted negligence on its part, with the result that when still another bale fell, one of its longshoremen was injured. By its own testimony, Carolina proved that it was experienced in the discharge of this particular type of cargo. It is an expert in this field and should have known the dangers involved. Its Vice President in charge of stevedoring, Mr. McCall, testified that in using this method, it was inevitable that some bales would come loose and fall back into the hold; in fact, he said that it was foreseeable. Carolina's ship foreman, Mr. Matthews, said that the straps themselves constituted a "common hazard" and that a certain number of them were bound to give way during the course of the discharge with the result that bales would occasionally fall.

11. Carolina Shipping Company makes no claim that the vessel was unseaworthy because of any defect with regard to her winches, hatches or cargo handling gear. Nor does it claim that its officers requested or demanded that the bale hook method be used for the discharge. It is true that the Chief Officer knew what method was being used, but he spent most of his time in his cabin, working on the pre-loading plan for the Gulf Ports, and he never saw anything about the discharge that put him on notice that it might be improper. Carolina did not ask the advice of the Chief Officer on how to discharge the bales. As stated by the court in Knox v. United States Lines Co., 294 F.2d 354, 1961 A.M.C. 1708 (3 Cir. 1961), at page 358: "The physical handling of an ordinary bale or bundle is the clearest example of a detail within the special competence and peculiar responsibility of the stevedoring contractor."

Carolina's primary contention is that the shipowner failed to supply the stevedore with cargo that was seaworthy, towit, that the straps around the bales contained latent defects. There is no doubt but that if the straps around the bales were defective, and if the stevedore had no prior notice of their defects, then an accident resulting from a defective strap, and free from any negligence on the part of the stevedore, would render the ship unseaworthy and would defeat its claim of indemnification over from the stevedore. In this case, however, there is no testimony as to what caused the particular bale to fall. It could have fallen as a result of one or both straps coming apart at the buckle, or slipping off the bale, or breaking, or any combination of these; it could even have fallen as a result of its having been a "hobo" bale, described by several of the witnesses, one which somehow got tangled up with the other bales and was allowed to leave the hold of the vessel without any hooks at all under its straps. To say that either or both straps around the bale broke because they were defective is to rely completely upon speculation and surmise. Even if this were the case, the stevedore can hardly claim that it did not have prior notice for at least three other bales had fallen prior to the one that struck Norris Evans, and nothing more was known about them than about the one which caused the injury. United States Lines Company v. King, 363 F.2d 658, 1966 A.M.C. 1695 (4 Cir. 1966). It is noted further that although Carolina's witnesses testified that the bale hook method of discharging baled cargo was generally used until it became apparent that the straps were not strong enough or adequate to hold the bales, none of them could remember a single instance when Carolina had ever stopped using that method, and switched to the rope nets or some other method. It is at least inferential that many more than three or four bales could have fallen back into the hold, or fallen on to the pier, before Carolina would have considered changing the method of discharge.

12. Obviously Carolina, like other stevedores, used the bale hook method of discharge because it was the most economical and fastest method. About a

third more tonnage per hour could be discharged by this method rather than by the use of the rope nets. At the same time, Carolina's employees admitted that it was foreseeable, when using the bale hook method, that because of the nature of the straps themselves, several bales would fall during the course of the discharge. Carolina chose to use this method despite its expertise in this field and its knowledge of what might happen.

## CONCLUSIONS OF LAW

1. It is well settled that a shipowner's obligation is to maintain a seaworthy vessel and that the obligation extends to a longshoreman who is employed aboard the vessel by an independent stevedoring contractor. Seas Shipping Company v. Sieracki, 328 U.S. 85, 66 S.Ct. 872, 90 L.Ed. 1099, 1946 A.M.C. 698 (1946). The duty, however, is only to furnish a vessel and equipment reasonably safe and fit for the purposes of its intended use. Marshall v. Ove Skou Rederi A/S, 378 F.2d 193, 1967 A.M.C. 2537 (5 Cir.), cert. den. 389 U.S. 828, 88 S.Ct. 86, 19 L.Ed.2d 84, 1968 A.M.C. 1502 (1967). When metal bands securing cargo are utilized by the ship as an instrument for cargo handling, whether it be loading or discharging, such bands are considered vessel's tackle, and as such, the warranty of seaworthiness attaches to them. United States Lines Company v. King, *supra*. I find that the SS PACIFIC TELSTAR and its gear and appurtenances were seaworthy, including the straps which were around the bales of cotton piece goods, whose primary purpose was to hold the bales together.

2. The Supreme Court of the United States has said that an improper method of handling cargo can amount to unseaworthiness. Morales v. City of Galveston, Tex., 370 U.S. 165, 82 S.Ct. 1226, 8 L.Ed.2d 412, 1962 A.M.C. 1450 (1962); Ballwanz v. Isthmian Lines, Inc., 319 F.2d 457, 1964 A.M.C. 925 (4 Cir. 1963). This Circuit has held that "operational negligence," or the negli-

gent use of otherwise seaworthy equipment, constitutes unseaworthiness, and is no longer a defense open to the shipowner in a claim brought against it by a longshoreman injured as a result thereof. Venable v. A/S Det Forenede Dampskibsselskab, 399 F.2d 347, 1968 A.M.C. 1437 (4 Cir. 1968) [Citing as authority Mascuilli v. United States, 387 U.S. 237, 87 S.Ct. 1705, 18 L.Ed.2d 743, 1967 A.M.C. 1702 (1967)].

The SS PACIFIC TELSTAR was rendered unseaworthy by the negligence of and breach of contract by Carolina. Norris J. Evans was injured as a result of it.

3. The unseaworthiness of the SS PACIFIC TELSTAR was brought about by the negligence of Carolina, in the following respects: Carolina had actual notice, prior to the accident, that the use of the bale hook method to discharge the cargo was resulting in some of the straps around some of the bales coming loose, coming apart or breaking; it had notice prior to the accident that at least three bales had dropped from outgoing drafts back into the hold, on to the deck, and on to the pier; those straps could have come loose because they were slipping out of the open ends of the buckles, or because they were being improperly hooked up by the stevedore's employees, or because they were breaking in some manner, or because of some other reason, which could have been ascertained. At no time before or after the accident did Carolina attempt to determine why the straps were coming off of the bales. Its failure to make such a determination, and to change the method of discharge to a safer method, if warranted, under the circumstances constituted a breach of its contract to perform its work in a workmanlike and non-negligent manner. Beard v. Ellerman Lines, Ltd., 289 F.2d 201, 1961 A.M.C. 2702 (3 Cir. 1961); reversed on other grounds by the United States Supreme Court in Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Inc., 369 U.S. 355, 82 S.Ct. 780, 7 L.Ed.2d 798

(1962); Rapko v. Transportacion Maritima Mexicana, S.A., 276 F.Supp. 961, 1968 A.M.C. 535 (E.D.Pa.1967); Reed v. Bank Lines, Ltd., *supra*; United States Lines Company v. King, 363 F.2d 658, 1966 A.M.C. 1695 (4 Cir. 1966).

Having breached its contract, Carolina must indemnify the shipowner for its damages.[2]

4. A stevedore must indemnify the shipowner for any loss suffered by the latter as a result of the failure of the former to discharge cargo in a workmanlike and nonnegligent manner, including the costs of litigation and reasonable attorney's fees. In Rederi A/B Dalen v. Maher, 303 F.2d 565, 1962 A.M.C. 1944 (1962), the Fourth Circuit Court of Appeals, speaking through Judge Sobeloff, stated:

> "It is now well settled that the stevedore is obligated to indemnify the shipowner for any loss occurring as a result of the failure of the former to stow or discharge cargo in a workmanlike manner * * *.

> "Equally clear is the shipowner's right to recover attorney's fees and

other expenses of litigation as part of the indemnity. The stevedore would have us hold that the shipowner is entitled to no indemnity in the present case because no judgment has been entered against the shipowner. But the argument over-emphasizes the importance of a formal judgment. In Waterman S.S. Co. v. Dugan & McNamara, Inc., 364 U.S. 421, 81 S.Ct. 200, 5 L.Ed.2d 169 (1960), the Court authorized an award of indemnity even though a longshoreman's claim had not been reduced to final judgment. True, in the Waterman case, no judgment was entered because the shipowner had settled the claim, while in the present case the stevedore himself made the settlement; but this distinction would not require a different result here under the applicable legal principles. * * *

> " * * * If a shipowner can show that the stevedore's breach of warranty has occasioned it expense, reimbursement is due. Of course, the shipowner must prove that the stevedore, in fact, breached its warranty and caused injury for which the ship-

2. In Beard v. Ellerman Lines, Ltd., *supra*, which is factually quite similar to the instant case, the Third Circuit stated:

"What has been said brings us to Ellerman's contention that if it 'is liable to Beard upon a theory of negligence * * * the undisputed evidence required the District Court to enter * * judgment in Ellerman's favor [against Atlantic] because it was clearly Atlantic's action which brought about the result and clearly it constituted a breach of a warranty of workmanlike service.'

"Our consideration of Ellerman's contention is controlled by the principles recently summarized in Waterman S. S. Corp. v. Dugan & McNamara, Inc., 1960, 364 U.S. 421, 423, 81 S.Ct. 200, 201, 5 L.Ed.2d 169, as follows:

'In Ryan [Stevedoring] Co. v. Pan Atlantic [S.S.] Corp., 350 U.S. 124 [76 S.Ct. 232, 100 L.Ed. 133], it was established that a stevedoring contractor who enters into a service agreement with a shipowner is liable to indemnify the owner for damages sustained as a result of the stevedore's breach of his warranty to perform the obligations of the contract with reasonable safety.

*This warranty of workmanlike service extends to the handling of cargo, as in Ryan, as well as to the use of equipment incidental to cargo handling, as in Weyerhaeuser S. S. Co. v. Nacirema* [Operating] Co., 355 U.S. 563 [78 S.Ct. 438, 2 L.Ed.2d 491]. The warranty may be breached *when the stevedore's negligence does no more than call into play the vessel's unseaworthiness.* Crumady v. The J. H. [Joachim Hendrik] Fisser, 358 U.S. 423, 429 [79 S.Ct. 445, 448, 3 L.Ed.2d 413] * *.' (Emphasis supplied.)

"Application of the principles stated to the indemnity action compels the determination, under the particular facts here and the jury's finding with respect to Ellerman's negligence, that Ellerman is entitled to indemnity from Atlantic as a matter of law.

"As already pointed out, the record affords ample basis for a jury fact-finding that (1) use of the bale hook method in the discharge of the burlap bales constituted negligence, and (2) that the injured longshoreman was not afforded a safe place to work."

owner was potentially liable and that the expenses incurred in defense are reasonable. The termination of the original libel presents no problem, for the shipowner may press its third party complaint even though the main action is settled and dismissed."

The release given by Norris Evans to the Shipowner, which is in evidence, recites a consideration of $137,500.00, paid to Evans by the Shipowner, along with the assumption by the Shipowner of any amounts which Evans owed or would thereafter owe to the Stevedore, his employer. This latter language obviously refers to the amounts paid by the Stevedore's compensation carrier to Evans in compensation under the Longshoremen's and Harbor Workers' Compensation Act, and the medical expenses incurred by him. The total amount of the Stevedore's lien is $25,663.28, and it counterclaimed against the Shipowner for this amount. The release clearly recites that the consideration for it consists of the sum of $137,500.00, plus the assumption of the lien, in the event the Stevedore should thereafter make claim against the longshoreman for the lien. Consequently, it appears that the settlement entered into by the Shipowner and the longshoreman which the Stevedore accepted as reasonable was for a gross figure of $163,163.28, which included the amount of the compensation lien. The settlement obviously contemplated that, if the Shipowner prevailed in its action for indemnification from the Stevedore, the compensation lien would be wiped out, since the Shipowner had assumed payment of it for the longshoreman. On the other hand, if the Stevedore had prevailed in the action for indemnification, the Shipowner, under the terms of the release, would have been obligated to pay to the Stevedore the full amount of its compensation lien. Jarka Corporation of New England v. United States Lines Company, 387 F.2d 436, 1968 A.M.C. 487 (1 Cir. 1967).

I therefore find that the Shipowner is entitled to recover from Carolina the sum of $137,500.00, with interest thereon from May 17, 1970, the date on which the longshoreman received his settlement, together with the costs of this litigation, including reasonable attorney's fees. The lien of the Stevedore and its compensation carrier is hereby extinguished, and its counterclaim dismissed. Shipowner's attorneys may petition the court for the award of a reasonable attorney's fee. Let judgment be entered accordingly.

And it is so ordered.